# Cary *v.* The State.

## *Indictment for Assault with Intent to Murder.*

1. *Oath of petit jury.*—A recital in the judgment-entry, in a criminal case, that the jury "were sworn well and truly to try the issue joined," without more, does not show a substantial compliance with the statute (Code, § 4765), but negatives the idea that the proper oath was administered; and the error will work a reversal of the judgment.

2. *Notary public; term of office of.*—Of the two classes of notaries public whom the governor is authorized to appoint, those "having the jurisdiction of justices of the peace hold their offices three years from the date of their commissions" (Code, § 1325), while the others hold, after the expiration of the three years, "until their successors are qualified."

3. *Judicial notice of public officers.*—Courts are required to take judicial notice of the various commissioned officers of the State, and to know their official signatures, the extent of their authority, the dates of their commissions, and the expiration of their respective terms of office.

4. *Warrant of arrest, issued by notary public as justice of the peace after expiration of term of office.*—A warrant of arrest issued by a notary public, as *ex officio* a justice of the peace, after the expiration of his term of office, has no legal validity, and does not authorize an arrest by an officer in whose hands it is placed, unless facts are shown which are sufficient to uphold the acts of the notary as an officer *de facto.*

5. *Officer de facto.*—The official acts of an officer *de facto* are just as valid for all purposes, so far as the public and third persons are concerned, as those of an officer *de jure ;* but, to constitute an officer *de facto,* color of election or appointment must be shown, or else an exercise of the office, and an acquiescence therein on the part of the public, for a length of time which would afford a strong presumption of at least a colorable election or appointment.

6. *Same ; notary public whose commission has expired.*—An expired commission is not color of title to the office of a notary public; yet a reappointment may be presumed from facts which would not justify the presumption of a popular election, and he may be held an officer *de facto* after the expiration of his commission.

7. *Self-defense.*—When a man is attacked in his own dwelling-house, he is not required to retreat, in order to invoke the benefit of the doctrine of self-defense; and his place of business is deemed, *pro hac vice,* his dwelling-house, within this principle.

8. *Arrest by private person.*—An arrest may be made by a private person, for any public offense committed in his presence, or where a felony has been committed, and he has reasonable cause to believe that it was committed by the person arrested (Code, § 4668); but it is his duty to carry the arrested person before a magistrate, "without unneces-

[Cary v. The State.]

sary delay" (*Ib.* § 4671), or to deliver him to an officer having lawful authority to arrest him; and it is no excuse for his failure to do so, that he was engaged in examining the prisoner when demanded by the officer.

9. *Charge on evidence, invading province of jury.*—When a question of fact is involved, dependent on oral testimony, the credibility of the evidence must be submitted to the jury; and a charge which assumes its credibility is erroneous, although the evidence may be clear and undisputed.

FROM the Circuit Court of Shelby.

Tried before the Hon. S. H. SPROTT.

The indictment in this case charged, in a single count, "that Walter S. Cary, unlawfully and with malice aforethought, assaulted Henry C. Reynolds with intent to murder him." The defendant pleaded not guilty, and was tried on issue joined on that plea. On the trial, a bill of exceptions was reserved by the defendant, which purports to set out all the evidence adduced, and states the following (with other) facts:

The evidence tended to show that, in July, 1882, several burglaries and larcenies were committed in Montevallo by a freedman named Frank Wells; and W. S. Cary, the defendant in this case, who was a practicing attorney in Montevallo, was employed by R. H. Little to arrest said Wells for trial on charges of those offenses committed on Little's property. Cary procured the arrest of Wells at Calera, seven miles from Montevallo; but Wells succeeded in escaping, and fled to the city of Montgomery, where he was again arrested by the police, at the instance of Cary, who then went to Montgomery, and brought him back to Montevallo handcuffed and tied. "In this matter Cary acted as a private person, and had no written authority for the arrest of Wells. On his arrival at Montevallo, Cary informed Frank Nabors, who was then acting notary public and justice of the peace, that he had arrested said Wells under verbal charges of burglary and larceny committed at Montevallo, and desired said Nabors, as such notary public and justice of the peace, to investigate said charges against Wells; and thereupon said Nabors told Cary to carry Wells to his (Cary's) office, and to keep him there until he (Nabors) gave other directions what to do with him. On receiving these instructions, Cary carried Wells to his office, handcuffed and tied, and guarded by persons acting in concert with Cary. At that time, there was a prevailing opinion among the people of Montevallo and its vicinity, that other persons, residing there, were accomplices of Wells in said burglaries and larcenies. Cary, when he carried said Wells into his office, told him that he desired him to make a full disclosure as to these matters, and to give the names of his accomplices. This was in the afternoon of the day on which Cary had arrived at Montevallo

with Wells, as above stated, about one o'clock. Thereupon, Wells commenced making a statement as to these offenses, and giving the names of his accomplices; and as he made his statements, Cary wrote down what he said. This business continued until after sunset of that day. While Cary thus had Wells in his office, said R. H. Little made an affidavit in writing before said Frank Nabors, charging said Wells with burglary, which affidavit was made for the purpose of procuring the arrest of said Wells, for a preliminary investigation before said Nabors;" and said Nabors thereupon issued a warrant of arrest for said Wells, and, by indorsement thereon, authorized and appointed H. C. Reynolds to execute it. The affidavit, warrant of arrest, and indorsement appointing Reynolds to execute it, were each in the usual form, dated July 29th, 1882, and signed by said Nabors, with the additions of the letters and words, " *N. P.*, *& ex officio J. P.*" The bill of exceptions states, that " there was no evidence offered of the appointment, or the time of the appointment of said Nabors, as notary public and justice of the peace ;" but said Nabors himself testified, without objection, " that he issued the warrant, and made the indorsement appointing Reynolds to execute it, as shown by the papers themselves, and was a N. P. and *ex off.* J. P. at the time." The defendant objected to the admission of each of these papers as evidence, and duly excepted to the admission of each.

The assault on Reynolds, with which Cary was charged, grew out of his attempt to execute this warrant of arrest; and the circumstances attending it are thus stated in the bill of exceptions : " When the warrant was delivered to Reynolds, he put a pistol, of the kind called a revolver, on his person, concealed by his clothes, and went to Cary's office, entered, sat down on a desk near the front door, and told Cary he had the warrant, and had come to arrest Wells, and to carry him before Nabors ; and he handed the warrant to Cary. Cary took the warrant, and read it, with the indorsement thereon, and made no objection because of any illegality or irregularity in either, but said, ' *All right; as soon as I get through, you can have him*,' or words to that effect. At this time, Cary was interrogating Wells, as above stated, and writing down his answers. When it became known in Montevallo that Cary had arrived with Wells, there was considerable excitement, and threats were made to form a mob and lynch Wells ; and this was known to Cary before Reynolds went to his office to arrest Wells. When Reynolds informed Cary that he had come to arrest Wells under the warrant, Cary said to Reynolds, *that he could not get Wells until he got through with him*. At this time, Reynolds was standing inside of the office, near the front door, and Cary was writing at a table in the rear of the room ; Wells sitting

[Cary v. The State.]

nearly between them, handcuffed, with a rope tied around his neck or arm. The room was about twelve by fourteen feet, having a door and two windows in the end fronting on the street. When Cary told Reynolds that he could not get Wells until he got through with him, one Shortridge came in, and asked Reynolds why he did not take Wells out; and Reynolds then took hold of the rope, and said that he would carry Wells before Nabors. To this Cary replied, cursing Reynolds, and saying, *that Reynolds could not carry Wells out of his office except over his dead body, and that he would kill any one who tried it.* At this time, Cary was holding a cocked pistol, of the kind called a repeater, in his hand. There had been evidence before this time, by two witnesses, that Reynolds had a pistol in his right hand, and near his hip, with the muzzle pointing towards Cary; but the evidence on the part of the State tended to show that this was not true. When Cary made this statement to Reynolds, the latter advanced one or two steps towards Cary, and as he advanced, holding open the left lapel of his coat, his right hand down towards his side, said, ' *Walter Cary, if you want to shoot me,* I am at your *mercy: now shoot;*' his manner, tone and movements being quick, short, excited, and angry. When Reynolds advanced to about two paces, as above stated, Cary shot him in the left side of his breast, the ball passing through the upper lobe of the left lung, and inflicting a serious, but not necessarily fatal wound;" and while Reynolds, who fell to the floor, seemed to be endeavoring to cock and present his pistol, Cary shot him a second time, inflicting a wound in his right arm which caused a permanent stiffness of the elbow joint. "The general character of Reynolds," it is added, "in the military service of the Confederate States, and in time of peace, is that of a cool, determined, brave man. The defendant stated, that, as Reynolds advanced on him, he saw a pistol in the right hand of said Reynolds; but there was evidence tending to show that this was not correct."

The court charged the jury in writing, among other things, as follows: "It is not denied that Cary shot Reynolds. Was it necessary for him to do so, in order to save his own life, or to prevent the infliction of great bodily harm by Reynolds? or was he impressed with a reasonable belief that it was necessary to shoot, in order to prevent the taking of his own life, or great bodily harm to himself? A man has a right to strike in self-defense, even to the taking of life, where it is necessary to do so in order to save his own life, or to prevent great bodily harm; but, before the law of self-defense can be invoked, the defendant must be without fault in bringing on the difficulty, or provoking it, and there must have been no other reasonable

[Cary v. The State.]

mode of escape. . . . A private person may arrest another, for any public offense committed in his presence; or where a felony has been committed, though not in his presence, by the person arrested; or when a felony has been committed, and he has reasonable cause to believe that the person arrested committed it. *The evidence shows that the defendant arrested the negro charged with burglary, without a warrant, or capias; that he took him to Montevallo, and there kept him in his custody for several hours; that a warrant was sworn out before a justice of the peace,* and Reynolds lawfully authorized to execute it; *that said Reynolds, in attempting to execute the warrant, was shot by the defendant, and this after he had seen and read the warrant. Reynolds had a right, and it was his duty under the warrant, to take the negro into his custody; and the defendant had no right to refuse to deliver him up, or to shoot Reynolds in order to prevent his taking him; and if he shot Reynolds in order to prevent him from taking the negro into his custody under the warrant, then he would be guilty as charged in the indictment.*"

The defendant excepted to the italicized portion of this charge, and also to nine other charges given by the court on the request, in writing, of the counsel for the State. Among the charges so given were the following: (1.) "There is no evidence before the jury that the defendant had the custody of the prisoner except as a private person." (2.) "If the jury believe that Nabors was a justice of the peace, and, as such justice, issued the warrant for the arrest of Wells, and in writing appointed Reynolds to execute the warrant; that appointment constituted Reynolds a lawful officer to execute the warrant, and it was the duty of the defendant to have submitted to such officer in the legal performance of his duty under the warrant." (3.) "The warrant for the arrest of Wells, and the appointment of Reynolds to make the arrest, was legal, and authorized Reynolds to take Wells into his custody, from the custody of the defendant; and Reynolds had a right to use force, if it was necessary, to make the arrest; and if the defendant shot him to prevent him from making the arrest, then the defendant would be guilty as charged."

The defendant requested numerous charges in writing, of which the court refused thirteen; and among those refused were the following: (13.) "If the jury believe all the evidence in the case, the writing purporting to be a warrant of arrest, and the indorsement thereon appointing Reynolds to execute it, conferred no authority on said Reynolds." (20.) "When one is attacked in his own house, he is never required to retreat; for it is his castle, and the law permits him to protect its sanctity from every unlawful invasion." (22.) "When one is at-

[Cary v. The State.]

tacked in his own office where he does business, he is not required to retreat; for the law permits him to protect it from any unlawful invasion." To the refusal of each of these charges exceptions were duly reserved by the defendant.

S. F. Rice, for appellant. (No briefs on file.)

T. N. McClellan, Attorney-General, for the State.

SOMERVILLE, J.—The judgment must be reversed, on the authority of *Storey v. The State*, 71 Ala. 330, and other cases there cited, for a defect in the administration of the oath to the jury. The recital is, that the jury " were sworn well and truly to try the issues joined," thus omitting the phrase, " and a true verdict render according to the evidence, so help you God," which is expressly made an essential ingredient of such oath by statutory requirement.—Code, 1876, § 4765; *Johnson v. The State*, 74 Ala. 537.

There are two classes of notaries public in this State, each of which is appointed by the Governor. The duties of the first class include the administration of oaths, taking acknowledgments of certain instruments of writing, the protesting of bills of exchange, and other like powers, such as are expressly prescribed by statute, or authorized by general commercial usage.—Code, §§ 1325, 1329–1331. These are notaries public in the common acceptation. The second class, in addition to these powers, possess also the jurisdiction of justices of the peace, civil and criminal, and are therefore judicial officers. The Governor is authorized by the constitution to appoint one notary of this class for each election precinct in the several counties of the State, and one for each ward in cities of over five thousand inhabitants, who are *ex officio* justices of the peace within their respective wards or precincts. While the statute expressly declares that the first class shall " hold office for three years from the date of their commissions, and until their successors are qualified," it is equally clear in the declaration that the second class shall " hold their office three years from the date of their commissions," thus, by obvious implication, excluding a construction which would permit them to hold for a single day after the expiration of their commissions. Code, § 1325; Const. 1875, Art. IV, § 26.

Courts are authorized and required to take judicial notice of the various commissioned officers of the State, and to know the extent of their authority, their official signatures, and their respective terms of office—when such terms commence, and when they expire.—*Graves v. Anderson, Green & Co.*, at present term; *Coleman v. The State*, 63 Ala. 93; 1 Greenl.

[Cary v. The State.]

Ev. (14th Ed.) § 6. "This cognizance," as observed in *Gordon v. Tweedy*, 74 Ala. 237- 8, " may often extend far beyond the actual knowledge, or even the memory of judges, who may therefore resort to such documents of reference, or other authoritative sources of information as may be at hand, and may be deemed worthy of confidence." The dates of these commissions are matters of public record in the executive department of the State government, being accessible to inquiry by all who may be concerned, and the law fixes the duration of each official term.

Under these principles of law, the Circuit Court was required to take judicial cogizance of the fact that French Nabors, who issued the warrant sought to be excluded from evidence, was commissioned by the Governor of Alabama as a notary public and *ex officio* justice of the peace, on the fifth day of May, 1879, and that his term of office expired on the fifth day of May, 1882, three years from the date of his commission, and several months before the issue of the warrant, which is shown to have been issued the twenty-ninth day of July, 1882. Nabors was not, therefore, an officer *de jure* when he assumed to do this official act; and unless he was an officer *de facto*, the paper must be held to have no legal validity as a warrant, and, consequently, to confer no authority upon Reynolds to make an arrest under it.—*Noles v. The State*, 24 Ala. 672. In this aspect of the case, excluding from consideration all inquiry as to its *de facto* character,—a point which we propose next to consider,—the paper should have been excluded from evidence as a legal and valid warrant, although admissible as a part of the *res gestæ*, if shown to have. been exhibited and read to the defendant, at or about the time of the difficulty between the parties, which resulted in the alleged shooting of Reynolds.

Was Nabors, however, a *de facto* officer at the time he isued the paper in question,—an act which was done within something less than three months after the expiration of his official term. The general statement is made, that he was an acting notary public at this time ; but there is no proof of any other official act being peformed by him within this period of time. It may be proper to consider the rules of law governing this feature of the case, in view of the fact that the cause must necessarily be remanded for a new trial, and additional evidence may be offered on this point.

The rule is well settled, that the official acts of an officer *de facto* are just as valid, for all purposes, as those of an officer *de jure*, so far as the public and third persons are concerned. *Joseph v. Cawthorn*, 74 Ala. 411, and cases cited. As observed by Sutherland, J., in *Wilcox v. Smith*, 5 Wend. 231, "the affairs of society could not be carried on upon any other principle."

[Cary v. The State.]

It is sometimes very difficult to determine whether one claiming to exercise the duties of an office, is an officer *de facto*, or a mere usurper. The distinction is sometimes said to be, that the former claims to hold under color of election or appointment, while the latter claims no authority or color of authority for his intrusion into possession of the office whose functions he undertakes to usurp.—*People v. Staton* (73 N. C. 546), 21 Amer. Rep. 479. The better and more modern view, however, is, that no color of election or appointment is needed to constitute one an officer *de facto*. While it is sufficient for such purpose, it is not a necessary pre-requisite. The true principle is, that there must be *either* some color of election or appointment, or else "an exercise of the office, and an acquiescence on the part of the public, for a length of time which would afford a strong presumption of at least a colorable election or appointment."— *Wilcox v. Smith* (5 Wend. 231), 21 Amer. Dec. 213 ; *State v. Carroll* (38 Conn. 449), 9 Amer. Rep. 409, 425. Or, as we find the rule stated elsewhere, " the mere exercise of the functions of an office will not be sufficient to make a person a *de facto* officer, where there is no claim to the office under color of an election or an appointment, unless the exercise thereof has been open, notorious, and continued for such a length of time, without the public having interfered, as to justify the presumption that the party was duly appointed." *Hildreth v. McIntire,* 19 Amer. Dec. 61, and Note on p. 68. In *Rex v. Bedford Level,* 6 East, 356, Lord Ellenborough defined an officer *de facto* as " one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law," thus adopting the definition of Lord Holt in *Parker v. Kett,* 12 Mod. 467, which was decided as far back as the year 1693. The definition is one now fully recognized in England, and has been generally adopted by the American courts in its broadest and most liberal sense.— *Wilcox v. Smith,* 21 Amer. Dec. 213 ; *Hildreth v. McIntire,* 19 Amer. Dec. p. 63, Note ; *State v. Carroll,* 9 Amer. Rep. 409.

To constitute Nabors a *de facto* notary, within the above principles, he must either have acted under color of appointment and claim of official right, or he must have continued to exercise the duties of his office, by public acquiescence, for such length of time and by such frequency of repetition as to afford reasonable presumption of his holding over under a re-appointment. The first commission having expired, without any right in law to hold over, it could not, in our judgment, lend color for any length of time beyond its expiration.

As observed by Butler, C. J., in *State v. Carroll,* 38 Conn. 449 (s. c., Amer. Rep. 426, *supra*), it seems " absurd to say that color from election or appointment can extend beyond the dis-

tinct and independent term for which the officer was elected or appointed—beyond the term when the election or appointment could be made operative, if legal." Yet, although an expired commission is not color of title to office, still, if an elected or appointed public officer continues, without break, and without question by the public, to exercise the functions of the office after the expiration of his commission, this is a continued exercise of the duties of the office by acquiescence, and, under the modern rule, constitutes the person thus acting an officer *de facto*. In *Brown v. Lunt*, 37 Me. 423, a justice of the peace, who held over without legal right or re-appointment, continued to act, and took an acknowledgment of a deed about *two years* after the expiration of his term of office. In *Gilliam v. Reddick*, 4 Ired. (N. C.) 368, where an officer elected to hold for four years, without any right to hold over, continued to exercise the duties of the office for about nine years, without re-appointment or re-election, an official act performed by him was sustained upon the ground that he was an officer *de facto*, acting openly and notoriously in the exercise of the office for a considerable length of time, and his act in the particular case, which was recording a deed, concerned the rights of third persons or the public, and was therefore deemed to be as valid as the similar act of a rightful officer.

It is manifest, moreover, that an appointment may often be presumed upon evidence which would fail to justify presumption of a popular election, because it is an investiture of office less public in its nature, and the whole doctrine imparting validity to the unauthorized acts of *de facto* officers is one based on justice, necessity and public policy, and is intended chiefly for the protection of an innocent public who may be ignorant of the officer's defect of official title.—*Joseph v. Cawthorn*, 74 Ala. 411.

These general rules will probably be sufficiently specific for the guidance of the court below upon another trial, and we need not, therefore, be more definite.

It is a familiar rule of our criminal law, that no man who is attacked in his own dwelling-house, is compelled to retreat, in order to invoke the benefit of the doctrine of self-defense. In *Jones v. The State* (*ante*, p. 12), at the present term, we held that one's place of business is deemed his dwelling, *pro hac vice*, and falls within the influence of the same principle. The defendant, Cary, being in his own law-office and place of business, was under no legal duty to retreat from any attack shown to have been made upon him by his adversary.

A private person may arrest another, where a felony has been committed, and he has reasonable cause to believe that the person arrested committed it, or for any public offense

[Cary v. The State.]

committed in his presence.—Code, 1876, § 4668.  And he may arrest one for felony, on any day, and at any time.  Upon making such arrest, it becomes every citizen's duty to take the alleged offender, "without unnecessary delay," before a magistrate, or to deliver him to a sheriff, constable, or other officer who may be authorized to make a lawful arrest, whose duty it is to "forthwith take him before a magistrate."—Code, 1876, § 4671.  Conceding that the defendant had lawfully arrested the man Wells, upon reasonable cause to believe that he was guilty of a felony, it was his duty to take him before a magistrate without unnecessary delay, or to deliver him to Reynolds, who was a deputized constable, provided that it had been made to appear, under the rules above stated, that Nabors was a *de facto* officer at the time he issued the warrant.  The former course he did not distinctly elect to pursue, having retained the prisoner in his custody for an entire day after his arrival at Montevallo.  It was no excuse for his failure to deliver to the constable, that he was engaged, from about one o'clock in the afternoon until sun-set, in examining the prisoner, with the view of inducing him either to criminate others or himself in the alleged burglaries.  Under the facts set out in the record, if the warrant was legal and valid, the constable had the right to have the custody of the prisoner ; but otherwise, if the warrant was void for want of a *de facto* official *status* in Nabors at the time he issued it.

While a court has power to state admitted facts to the jury, in charging them, and, where the testimony is all in writing, to charge directly upon it, without referring its credibility to them ; yet, "when a question of fact is involved, dependent on oral testimony, the credibility of the evidence must be referred to the jury ; and a charge assuming the credibility of the testimony is erroneous, though it is clear and undisputed."—*Tidwell v. The State*, 70 Ala. 33 ; *Bain v. The State*, *Ib.* 4 ; 1 Brick. Dig. p. 336, §§ 8-9.  In view of this principle, it was an invasion of the province of the jury, for the court to state what was shown or proved by the evidence in any of its phases.

We can not see that a discussion of the other rulings of the court would facilitate proceedings upon another trial of this cause, which necessarily follows its remandment.  The phase of the case, and the bearing of the charges, may be greatly changed by the evidence, and many of the principles involved are familiar in view of their repeated discussion.—*Storey v. The State*, 71 Ala. 329 ; *DeArman v. The State*, *Ib.* 351 ; Clark's Cr. Dig. p. 4, § 26.

The judgment of the Circuit Court is reversed, and the cause is remanded.  The defendant must, in the meanwhile, be retained in the custody of the law, until discharged by due process.