# DAVIS *v.* THE UNITED STATES.

CRIMINAL LAW; ASSAULT WITH INTENT TO KILL; INDICTMENTS; ARREST; INSTRUCTIONS TO JURY.

1. Although the offense charged in an indictment for an assault with intent to kill, under Secs. 1144 and 1150, R. S. D. C., is not a felony but a misdemeanor only, the fact that the indictment charges the accused with having *feloniously* made the assault, will not vitiate the indictment.

2. Nor is such an indictment bad which fails to set forth the means or instrument with which the killing was attempted to be perpetrated, the means employed in the attempt to kill being matter of proof.

3. Where a form of indictment for assault with intent to kill has been in use for seventy years and has received frequent judicial approval, nothing short of an apparent danger that it might operate to the prejudice of the accused would justify a disturbance of the settled practice in drafting such indictments.

4. If a felony has been actually committed, the arrest of a person whom there is reasonable cause to suspect committed the crime, by a private individual, without a warrant, is justifiable.

5. Such reasonable cause exists where money had been stolen from an express company while in the care of its messenger, the accused, and where a false and counterfeit seal which had been applied to a pouch from which the money was abstracted,

in place of the genuine seal, had been made for and delivered to him while in the employ of the company.

6. Where the person so suspected when called into a room in the express company's office and in the presence of the superintendent of the company, a detective and the maker of the counterfeit seal, and identified by the latter as the one who ordered it, and accused of the theft and called upon to account for the stolen money, commits an assault with intent to kill upon the sealmaker, for which he is indicted, it is not error for the trial court, in the trial under such indictment, to refuse instructions to the jury offered by the defendant, which afford no ground of justification for the offense charged, but raise questions as to what constitutes a technical arrest or a constructive imprisonment, and as to whether in this District a private person has authority to make an arrest for any criminal offense.

No. 964. Submitted April 5, 1900. Decided May 11, 1900.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia upon the verdict of a jury finding him guilty of an assault with intent to kill. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Fred Beall* for the appellant.

*Mr. Thomas H. Anderson,* United States Attorney for the District of Columbia, and *Mr. H. T. Taggart,* Assistant Attorney, for the United States.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This appeal is from the Supreme Court of the District of Columbia, in special term, wherein the defendant, George R. Davis, was indicted for and convicted of the crime of an assault with intent to kill. The indictment charges that the defendant, " with force and arms, at, etc., in and upon one Arthur Baumgarten, feloniously did make an assault, with the intent him, the said Arthur Baumgarten, then and there feloniously to kill, and other wrongs and injuries to the said Arthur Baumgarten then and there did, to the

great damage of said Arthur Baumgarten, against the form of the statute in such case made and provided," etc.

There was a motion made by the defendant to quash the indictment, but that motion was overruled. Whereupon the defendant pleaded not guilty; and upon the issue thus made the defendant was tried and convicted.

There was then a motion entered in arrest of judgment, but that motion was also overruled by the court, and thereupon sentence was imposed upon the defendant; and he has appealed.

There are several assignments of error, and questions are presented both in respect to the sufficiency of the indictment, and upon the admissibility of evidence, and also upon the refusal to give certain instructions to the jury, upon the whole evidence of the case.

There are two questions that relate to the sufficiency of the indictment: (1) Whether the indictment is bad, because it charges the attempt to kill to have been *feloniously* made; the offense charged not being a felony, but a misdemeanor only. (2) Whether the indictment is legally insufficient, because it fails to specify and set forth the means or instrument whereby the attempt to kill was designed to be perpetrated.

1. With respect to the first of these objections to the indictment, we are clearly of opinion that there is no reasonable foundation upon which it can be sustained. The indictment is founded upon sections 1144 and 1150 of the Revised Statutes relating to the District of Columbia. By these sections it is provided that every person convicted of an assault *with intent to kill*, shall be sentenced to suffer imprisonment, etc. Therefore any unlawful assault made with intent to kill a human being constitutes the crime; and if the attempt made in this case had been effectuated and the assault resulted in death, whether the crime, on the facts of the case, would have been murder or manslaughter at the common law, could make no difference as

to the question of the defendant's guilt under the statute. The facts are considered in aggravation or extenuation as they may appear in proof, in determining the *quantum* of punishment to be inflicted. The unlawful assault with intent to kill is but a misdemeanor; but if the unlawful attempt to kill had been effectuated, resulting in death, the crime would have been felony, whether the act of killing was of the grade of murder or manslaughter. The unlawful attempt charged being to do an act which, if consummated, would have been a felony at common law, it is not apparent in reason why the averment that the accused did *feloniously* make an assault with the intent him, the said Baumgarten, then and there *feloniously* to kill, is improper. In charging the offense under the statute, it would seem to be proper to employ some appropriate terms to show that the intent of the party making the assault was to effectuate a felonious act, and thus to show that the homicide, if it had been accomplished as intended, would not have been either an excusable or justifiable homicide. The term "feloniously," therefore, would seem to be proper to characterize the intent with which the assault was made;—that is to say, to show the character and legal quality of the act if it had been consummated. If the attempt was to do a felonious act, the charging that it was done feloniously is simply to charge that the attempt was malicious and made with the intent to commit a crime; and that would seem to be the signification of the term "feloniously" as used in the indictment. 1 Bish. Cr. Law, Sec. 736.

But suppose that the use of the term "feloniously," as employed in the indictment, is an unnecessary and inappropriate term, the offense charged being a misdemeanor only, does the use of such term vitiate the indictment and render it legally insufficient to support a judgment thereon, for a misdemeanor as charged? We are decidedly of opinion that it does not.

In England, prior to the statute of 1 Vict., Ch. 85, passed

in 1837, and that of 14 and 15 Vict., Ch. 100, passed in 1851, when a very technical rule of criminal pleading prevailed, and the distinction between the crimes of felony and misdemeanor, in the forms of indictments, was strictly observed (for reasons no longer applicable, if ever founded in sound reason), the rule was, that a party indicted for a felony, or charged with doing any act "feloniously," could not, on the same indictment, be convicted and sentenced for a misdemeanor, even if the facts proved at the trial clearly amounted to a misdemeanor and nothing more. This was the long established rule in the English courts, as is shown by the leading case of *The King* v. *Westbeer*, 1 Leach, 12, and 2 Str. 1137, decided in 1740. This rule prevailed in the English courts until the passage of the statutes to which we have referred, which effected a radical change in the rule, in getting rid of a senseless technicality, the only effect of which was to defeat the ends of justice. And while in this country the rule was never *generally* accepted, yet there were a few States in which the rule did prevail for a time; as in Massachusetts (*Comm.* v. *Newell*, 7 Mass. 249), in Vermont (*The State* v. *Wheeler*, 3 Vt. 347), and Maryland (*Black* v. *State*, 2 Md. 376). These cases are all open to serious question, if not quite outside the limit of citable authority.

In the case of *Black* v. *State, supra,* the defendant was indicted for and convicted of "felonious" burning a stack of hay; but as that act was only a misdemeanor, it was held that no judgment could be rendered on the verdict, finding the defendant guilty of having done the act feloniously;—thus following the former English rule, and the ruling in the case of *Comm.* v. *Newell, supra.* It is somewhat remarkable, however, that the court should have overlooked the prior case of *State* v. *Dent,* 3 Gill & John. 8, where, on motion in arrest of judgment, the court had sustained the indictment, which charged that the defendant " did make an assault, with the intent him the said Daiger then and there *feloniously,* wilfully, and of his malice aforethought, to

murder, contrary," etc. In that case of *State* v. *Dent*, it was held, that the indictment was for an assault and battery only, and the *quo animo* was to be collected from the circumstances shown in proof. It was enough to state with the usual precision, the facts requisite to constitute an assault and battery, and to aver the intent with which it was made; and that the indictment was sufficient to support the verdict of the jury, which found the defendant guilty.

In the case of *Comm.* v. *Newell, supra,* where the former English rule upon the subject was followed, the party was charged with *feloniously* breaking and entering a dwelling house with intent to commit a mayhem; and it was held, that the prisoner could not be convicted of an aggravated assault, since the offense of mayhem was a felony at common law, and the assault only a misdemeanor.

But that case, in the subsequent case of *Comm.* v. *Squire*, 1 Metcalf, 258, was overruled; and the court held, in accordance with what would appear to be the reason of the matter, that whenever acts which constitute only a misdemeanor are alleged to have been done feloniously, and the accused is found guilty by the jury, the word "feloniously" may be rejected as surplusage, and the party be punished for the misdemeanor. In that case the court, in the course of its opinion, said:

"Does the use of this form of allegation necessarily, and in all cases, indicate a charge of felony? We think not. The nature of the accusation is to be determined by the acts charged to have been done, as well as by the technical terms introduced into the formal parts of the indictment. It is true there are certain technical terms necessary to be used in an indictment for felony; and no facts charged would constitute a proper indictment for a felony unless they were alleged to have been done feloniously. The combined allegations of the necessary acts, and of the felonious character of these acts, constitute the proper charge of felony. But the application of the term 'feloniously' in

an indictment constituting no higher offense than a misdemeanor, does not make it a charge of felony. The term 'feloniously,' in such case, is improperly introduced into the indictment, and can have no effect, but must be rejected as surplusage.

"We understand the rule in such cases to be this: Where the matter alleged to be repugnant does not enter into the substance of the offense, and the indictment would be good without it, it may be rejected as surplusage, and does not vitiate the whole indictment. Thus in 1 Chit. Crim. Law, 237, it is said that if an act be charged to have been done with a felonious intent to commit a crime, and it appears upon the face of the indictment, by the facts charged, that the crime, though perpetrated, would not have amounted to a felony, the word felonious being repugnant to the legal import of the offense charged, must be rejected as surplusage."

And further in the opinion the court say:

"In looking at the matter practically, as it regards the accused, we can perceive no possible injury that could result to a party, charged with an offense, from the introduction of the word 'feloniously' in connection with a charge of misdemeanor. The case is to be tried as to the guilt of the party in reference to the facts alleged against him. If the perpetration of the acts in the manner charged, be proved, and those acts do constitute a felony, the felonious character of the act is established, and if they amount only to a misdemeanor, assuming the acts to be proved, they are not committed feloniously, because the acts themselves do not constitute a felony."

The American text writers upon the subject seem to be in entire accord in laying down the principle, that if an indictment sets out the facts of an offense and lays it as a felony, yet in matter of law it is found to be a misdemeanor only, a judgment for the misdemeanor may be sustained upon it, notwithstanding there can be no conviction

of misdemeanor on an indictment for felony; the word "feloniously" in the allegation in such case being rejected as surplusage. For it is a principle in all legal pleadings that mere surplusage does not vitiate that which is sufficiently alleged. 1 Bish. Cr. Law, Sec. 810; Whart. Cr. Prac. and Plead., Sec. 261.

And if the word "feloniously" be rejected as surplusage, as matter of informality, and as not being essential to the validity of the indictment, then the indictment is sufficient, upon which to found the judgment. It is expressly enacted, by Sec. 1025 of Rev. Stats. U. S., that, "No indictment found and presented by a grand jury in any of the courts of the United States, shall be deemed insufficient, nor shall the trial, judgment, or other proceedings thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant." The rejection of the word "feloniously," if it be regarded as surplusage, could in no possible manner affect prejudicially any right or privilege of the defendant, nor would the rejection of the word affect the form of the judgment.

We are of opinion, therefore, that the first objection taken to the indictment affords no ground for arresting the judgment.

2. Then, as to the second objection taken, that the indictment fails to set forth the particular means or instrument used in the attempt to perpetrate the crime of killing the party assaulted. This objection, we think, is equally untenable as the first. The statutory description of the offense is "assault with intent to kill." The statute does not require or designate any particular means to be used, in order to constitute the offense. The assault and intent to kill must concur; but it is not required that in the indictment it shall be alleged and set forth with what means or instrument the killing was attempted to be perpetrated,— whether with gun, pistol, sword, knife or club. If the

16 Ct. App.—30

statute had prescribed the means or manner of killing, as by poisoning or drowning, then it would be necessary to allege the means to bring the offense within the statute. But that is not the case here. In a case such as the present, it is enough to charge the making of the assault coupled with the intent to kill; and the means employed in the attempt are matters of proof. It is said that in an indictment for an assault with intent to commit an offense, the same particularity is not necessary as is required in an indictment for the offense itself. Whart. Cr. Law, Sec. 614. In this District a settled practice has prevailed ever since the passage of the act of Congress of March 3, 1831 (4 Stat. at L. 448), from which sections 1144 and 1150 of the Rev. Stat. D. C., were principally taken, by which indictments of the same character and form as the present have been uniformly maintained by the courts, without any averment of the means or instruments by which the assault was made to carry into effect the attempt to kill. This is apparent from the cases of *United States* v. *Lloyd,* 4 Cr. C. C. 472; *United States* v. *Herbert,* 5 Cr. C. C. 87; *United States* v. *Tharp,* 5 Cr. C. C. 390, and *United States* v. *Angney,* 6 Mackey, 66. Whatever might be thought of the form of the indictment, if it were now for the first time to be passed upon, that form has been so long accepted, and so often approved, by the courts of this District, that nothing short of an apparent danger that it might operate to the prejudice of the defendant, would justify a disturbance of the settled practice. There is nothing, however, to indicate in the slightest manner that this form of the indictment could operate to the surprise or prejudice of the defendant; and, in fact, the form of the indictment seems to be strictly in accordance with established precedents elsewhere. We have an instance of such precedent in the case of *State* v. *Dent,* 3 Gill & John. 8, where, in an indictment for an assault with intent to murder, it was held not to be necessary to state the instrument, or means made use of by the

assailant, to effectuate the murderous intent.    See, also, the
case of *People* v. *Pettit*, 3 John. 504, where the same princi-
ple is asserted.    And in 1 Wharton's Criminal Law, section
292, it is laid down as a settled rule of criminal pleading
that, "The means of effecting the criminal intent, or the
circumstances evincive of the design with which an act
was done, are considered to be matters of evidence to go to
the jury to demonstrate the intent, and not necessary to be
incorporated in an indictment."    And this proposition is
quoted with approval by the Supreme Court of the United
States in the cases of *United States* v. *Simmons,* 96 U. S. 364,
and *Evans* v. *United States,* 153 U. S. 594–5.

We are, therefore, of opinion that the indictment is suf-
ficient, and that there was no error in overruling the motion
in arrest of judgment.

3. The consideration of the second objection to the indict-
ment, for the want of sufficient averments as to the means
and manner of making the assault charged, disposes of the
exceptions taken to the admissibility of the testimony of the
witnesses, Baumgarten, Hockaday and Leith, their testimony
relating to the manner and means of assault; and the rul-
ings of the court in respect to which constitute the second
assignment of error.    The evidence was clearly admissible,
and there was no error in the rulings of the court in rela-
tion thereto.

4. We come now to the facts of the case, as shown in
proof, and the rulings of the court thereon.

The material facts are, as we gather them from the record,
and about which there would seem to be no dispute or ques-
tion, that, at the time of the assault committed by the defend-
ant, that is to say, on the 16th of August, 1899, and for
some time prior thereto, the defendant was and had been
employed by the Southern Express Company, as a messen-
ger on trains running between the cities of Washington,
D. C., and Atlanta, Ga.    That, on the run from Atlanta to
Washington, on the 4th of July, 1899, a package containing

$1,000, consigned to a party in the city of New York, was abstracted from an express pouch, which was contained in a locked safe, and which was under the control of the defendant on that run. That the pouch was secured by a lead seal impressed with the company's regular seal press; and that when the pouch arrived at its destination, it was found that the package of money had been stolen from it; that the genuine seal had been removed, and a false and counterfeit seal, in the similitude of the genuine one, had been impressed as a substitute for the genuine seal. It further appears, that, upon an investigation of the matter by the agents of the company, it was discovered that Arthur Baumgarten, a seal maker in the city of Washington, had made for and delivered to some person, the spurious or counterfeit seal press (without any suspicion of criminal complicity, as we infer), with which the false and counterfeit seal on the pouch had been produced; and hence the identification of the person to whom this seal was delivered became a matter of prime importance in the investigation.

It appears that, on the day that the assault was made, Baumgarten, by request, came to the office of the Express Company, on Pennsylvania avenue, and there saw the defendant, and recognized him as the person for whom the seal press had been made, and to whom it had been delivered, some time between the 17th and 20th of June, 1899; and so informed Mr. Hockaday, the superintendent of the company, and Mr. Leith, a detective in the employ of the company. These three persons retired to an adjoining room, and, upon consultation, the defendant was then called in. The three persons first in the room, namely, Baumgarten, Hockaday and Leith, testified in support of the prosecution, in regard to what transpired in the room after the defendant was called in. They all agreed in testifying that when Baumgarten was called upon to say whether the defendant was the person for whom he made the seal press, and to whom he delivered it, he at once identified

the defendant as that person; and, upon the defendant being requested by Leith to tell all about it, or to produce the money, there being some discrepancy as to what was the exact language employed, the defendant then and there responded by calling Baumgarten a liar, and at once drew a revolver from his pocket, aimed it at Baumgarten, and fired, and that the ball was deflected by the prompt intervention of Leith, who threw up the arm of the defendant; and then a struggle ensued in which the defendant fired three other shots, one of which passed through Leith's coat, but none of the shots took effect. The defendant was then seized and overcome, and the pistol taken from him; and he was taken into custody by an officer.

The defendant testified in his own behalf; and while his testimony was, in some respects, variant from that given by the witnesses for the prosecution, yet his testimony was in many particulars corroborative of that given by the other witnesses. He, however, denied that he had any participation in abstracting the money from the express pouch.

Upon the whole evidence, the defendant requested some fourteen separate instructions to be given to the jury. Of these the first, second, third, fourth, fifth, sixth, seventh, eighth and fourteenth were given as requested, and the others were refused. But by the requests granted, in connection with the instruction contained in the charge of the court to the jury, the case was fully and fairly submitted to the jury for consideration.

The propositions that were refused were of an abstract character, and were applicable, not to a criminal prosecution like the present, but more properly to a civil action for false arrest and false imprisonment. The instructions refused, if they had been given, would have been very misleading to the jury. As to what constitutes a technical arrest or a constructive imprisonment; or whether there is authority under the laws of the United States, in force in this District, to authorize a private person to make an arrest

for any criminal offense—propositions embodied in the requests made—are certainly not questions that can be invoked as furnishing grounds of justification and defense in a prosecution like the present, whatever might be the determination in respect to such questions in an action where they could properly arise.

That there had been a felony committed in the robbery of the express pouch there was no question or dispute raised, though the defendant denied all connection with the commission of the felony. The only question was whether there was reasonable cause for the suspicion that he was the guilty party. If there was such reasonable cause for the suspicion of the defendant, it was clearly the right of the express company and its agents to examine into and investigate the facts of the case, and to ascertain, if possible, who was the guilty party. This was a plain duty to itself, as well as a duty to its patrons and the public. This examination was proper among the employees to whose care the stolen property had been intrusted. In this case it would appear, according to the evidence produced by the Government, that the property was stolen while in the care of the defendant as messenger; and that the false and counterfeit seal press which had been applied to the pouch from which the money was abstracted, in the place of the genuine seal, had been made for and delivered to the defendant while he was in the employ of the express company. These facts would appear to afford ample ground for a reasonable or probable cause of suspicion of the defendant; and, on such state of case, he was liable to arrest, to be delivered over to an officer of the law, by a private individual without warrant, though at the peril of such individual making the arrest, if no felony had been in fact committed.

In 2 Hale, P. C., pp. 77 and 78, in treating of what a private person may do upon a felony committed, the author says: "The third case is, where there is a felony committed,

but whether committed by B or not, *non constat,* and there-
fore we will suppose, that in truth it were not committed
by B, but by some person else, yet A hath probable cause to
suspect B to be the felon, and accordingly doth arrest him;
this arrest is lawful and justifiable, and the reason is, because
if a person should be punished by an action of trespass,
or false imprisonment for an arrest of a man for felony
under these circumstances, malefactors would escape to the
common detriment of the people.

"But to make good such a justification of imprisonment:
1. There must be in fact a felony committed by some per-
son; for were there no felony, there can be no ground of
suspicion. Again, 2. The party (if a private person) that
arrests, must suspect B to be the felon. 3. He must have
reasonable cause of such suspicion, and that must be alleged
and proved." And if a felon be pursued by private per-
sons, though there be no warrant of arrest, nor any con-
stable in the pursuit, yet, the felony being proved, it is
murder for one of the defendants to kill one of the pur-
suers. *Jackson's Case,* as reported in 1 East P. C. 298.

By the American authorities the principle is laid down
with equal clearness as in the authorities just cited. In
the case of *Holley* v. *Mix,* 3 Wend. 353, it was declared and
held, that "if a felony has, in fact, been committed by the
person arrested, the arrest may be justified by any person
without warrant, whether there is time to obtain one or
not. If an innocent person is arrested upon suspicion by
a private individual, such individual is excused if a felony
was in fact committed, and there was reasonable ground to
suspect the person arrested. But if no felony was com-
mitted by any one, and a private individual arrests without
warrant, such arrest is illegal." The same principle is laid
down in the case of *Wakeley* v. *Hart,* 6 Binney, 316, and in
many other cases, as will appear upon reference to *Comm.*
v. *Deacon,* 8 Sergt. & R. 48; *Brooks* v. *Comm.,* 61 Penna. St.
352; *Carr* v. *State,* 43 Ark. 99; *Allen* v. *Leonard,* 28 Iowa, 529;

*Reuck* v. *McGregor*, 3 Vroom, 70; *Carey* v. *State*, 76 Ala. 78. And the principle of these cases is very clearly stated by Wharton, upon review of all the authorities, in sections 2932 and 2933 of his work on Criminal Law, (7th Edition).

But in this case, the proof shows that there was no ground whatever even for a pretense of justification for the attempt to kill Baumgarten. The defendant admits in his testimony that there was no physical violence of any kind offered to his person, before his attempt to shoot Baumgarten. There had not even been a threat made to send him to prison. He says he was accused of stealing the money, and was called upon to account for it, and that excited his apprehension as to what might be done by those present. Even if an ordinary assault had been made upon the defendant, with only such force as might have been necessary to effect his arrest and detention, in order that he might be placed in the custody of a police officer, that would not have been a justification for the assault with intent to kill. "It is clear," says the Supreme Court of the United States, "that to establish a case of justifiable homicide it must appear that something more than an ordinary assault was made upon the prisoner; it must also appear that the assault was such as would lead a reasonable person to believe that his life was in peril. *Wallace* v. *United States,* 162 U. S. 466." *Allen* v. *United States*, 164 U. S. 492, 498. There was an entire absence of any ground whatever that could have induced the defendant to believe that his life was in peril, from what occurred in the room, prior to his drawing and firing his pistol. None of the requests for instruction, offered by the defendant, and which were refused by the court, afforded any ground of justification for the offense of which the defendant was charged; and therefore there was no error in rejecting them.

It follows that the judgment must be affirmed; and it is so ordered.                         *Judgment affirmed.*

Mr. Justice SHEPARD, dissenting:

Though concurring in some of the views expressed in the opinion in this case, I am unable to assent to the conclusion arrived at.   In my opinion the judgment of the court below should be reversed for reasons which, owing to the pressure of business towards the conclusion of the term, I can only state with brief explanation. .

Chapter 36 of the Revised Statutes of the United States for the District of Columbia, under the title, "Crimes and Offenses," embodies the provisions of acts of Congress enacted between A. D. 1831 and A. D. 1870.

Sections 1144 to 1158, inclusive, do not undertake to create or define crimes or offenses, but are confined to the imposition and regulation of penalties for crimes existing at common law, and, by the laws of Maryland and the act of cession, in force in the District of Columbia.   Section 1150, under which this conviction was had, reads as follows :

"Every person convicted of manslaughter, or of any assault with intent · to kill, shall be sentenced to suffer imprisonment and labor for the first offense for a period not less than two nor more than eight years, and for the second offense for a period not less than six years nor more than fifteen years."

Assault with ·intent to murder was an offense at common law most seriously punished.   There was no such offense as assault with intent to kill.

An assault, under such circumstances as would constitute murder if resulting in the death of the party assaulted, was an assault with intent to murder.

If sufficient to constitute manslaughter only it was merely an assault of an aggravated character.   Such an intent to kill "was a great misdemeanor."   4 Bl. Com. 196.

As assault with intent to murder was a well known and very serious crime, it is not to be presumed that Congress could have intended to omit it from the list of penalties. Hence, though it is a process of broad construction, I can

agree that the word "kill" in the section aforesaid was used in the sense of murder, on the ground that the substitution was an act of inadvertence; but I can perceive no ground whatever for construing it to mean both murder and manslaughter.

No one will deny that Congress could have created a new offense of assault with intent to kill by defining it with sufficient distinctness as such and have provided a severe penalty for its violation.

But it is quite clear to my mind that it had no such intention in the enactment aforesaid. That section, and others mentioned, undertook to provide uniform penalties for certain pre-existent offenses; there is nothing to indicate an intent to create a new offense. Had the word "murder" been used instead of "kill," the accused could not be punished as therein provided unless his offense would be murder in case death had ensued. If "kill" is accepted as the equivalent of murder the result must be the same. If another reason be needed for the conclusion that the penalty for an "assault with intent to kill" was not intended to apply to an assault that might, if fatal in its consequences, amount to nothing more than manslaughter, it is found in the absence of discrimination in the penalty itself. Murder is punishable capitally; the extreme limit for manslaughter is imprisonment for eight years; and yet, upon the construction adopted by my brethren, attempts to murder, or to commit manslaughter, are punishable alike, and to the same extent as manslaughter. There is a sound reason, sanctioned by long usage and common legislation of the States, for punishing an assault with intent to murder with the same severity as manslaughter; but no such reason applies in fixing the penalty for assault with intent to commit the latter.

That the omission to preserve the old and uniform rule of discrimination in the matter of punishment was intended to be supplied by the latitude of discretion permitted the

court in imposing the sentence, is an unwarranted conclusion. The same latitude has always been permitted, but for wholly different reasons that are patent. But to say—for such is the logical result of the argument—that the court may consider whether the assault was with intent to murder, or to commit manslaughter only, and impose the penalty according to either view, is to confer upon the court a power that belongs exclusively to the jury.

It is for the jury to find the existence of guilt of a particular offense, and for the court to impose the sentence of the law upon such verdict.

In all criminal cases the accused may be found guilty of any offense the commission of which is necessarily included in that with which he is charged in the indictment. R. S., Sec. 1035. Under this the jury could have been instructed to find the defendant guilty of assault only if they could not find him guilty of assault with intent to murder. In fact the court did so charge; but the benefit of it was entirely taken away by words immediately following, viz.: "The duty of the jury in this case is a simple one. If the jury are satisfied beyond all reasonable doubt from the evidence that the defendant did, as charged in the indictment, within the District of Columbia, on the 16th day of August, 1899, discharge a loaded pistol at Arthur Baumgarten with the intent then and there him, the said Baumgarten, to kill, they should find him guilty as charged in the indictment."

If I am right in my construction of the statute, the circumstances of this case made it the duty of the court to inform the jury of the difference between murder and manslaughter, and to submit to their finding whether the assault amounted to an attempt to commit the one or the other.

These circumstances are, briefly: The accused went on duty at Atlanta at 10 A. M., August 15, and started on his run to Washington at 12; he arrived at Washington

460    DAVIS *v.* UNITED STATES

Dissenting Opinion.      [16 App.

August 16, at 6.45 A. M., having been engaged in attending to his duties the entire time. Under the rule of the express company he carried a pistol. Whilst checking up his work he received a message to report at the general office at 9.30. Finishing his work, he hurried to breakfast and reported at the office as required. Here he was directed to do some writing. This was evidently done to give Baumgarten an opportunity to identify him as the person for whom he had made a certain seal, though the accused, apparently, had no suspicion of such purpose. He was subsequently called into another room by Hockaday. Baumgarten and Leith, a detective, were there. The door was closed and apparently locked. The detective said to accused : " You had a seal made at this man's (Baumgarten) place," and asked Baumgarten if accused was the man. The latter nodded. Hockaday then said : " Davis, you had as .well own up; we have sufficient evidence to know that you are the man that got the money." Leith immediately said : " I will give you five minutes to fork (or cough) up the money."

Accused testified that he was innocent ; was taken by surprise ; had had no sleep for twenty-four hours, and was surrounded by three persons who held him practically in arrest, and threatened him. He said he called Baumgarten a liar, and drew his pistol, not to kill anyone, but to protect himself. He said that he did not intend to kill Baumgarten. The detective was a large and powerful man, and, at the time of his demand to "fork up" the money, was near defendant—so near that he seized and overpowered him after he drew his pistol.

A number of instructions were prayed by the defendant, in respect of the question of his unlawful arrest and false imprisonment by Hockaday and the detective, which, it may be conceded for the purposes of this opinion, were correctly refused because too general in their terms to be applicable to the facts of the case. But, from the point of view of the accused, I think it clear that he was subjected to

treatment of, at least, an improper and unjustifiable character.

The right of a private person, when a felony has actually been committed, to arrest and detain one whom he has good reason to believe guilty thereof, has been discussed at length in the opinion of the court, and affirmed with great latitude. Whilst I concede a limited right of this kind under special circumstances and conditions, yet the doctrine has been stated in terms so broad that I can not subscribe to it. But I pass the question, as I do not regard it as necessarily involved in the case.

There is no pretense that these men contemplated the mere arrest of the defendant for the felony which they believed he had committed. They had suspected defendant of stealing the money from the express safe, and arranged for him to come to the office where he might be identified by the sealmaker. They were in the National Capital, with courts open and vigilant officers at call. It was their duty to arrange, in the regular and formal way of the law, for defendant's arrest whenever their suspicions should be confirmed by the identification of the sealmaker. Had they done this there would have been no assault, no second crime to charge against him.

Instead of pursuing this regular and commendable course, they called him into a private office, closed the door and attempted to force him to confess the crime charged. This conduct was sufficient to cast doubt upon their ability to fasten the theft upon defendant, and even upon the reasonableness of the foundations of their belief in his guilt.

As the result of their unjustifiable conduct, the defendant has not been brought to trial for the crime which they attempted to force him to confess. Instead, they contributed to leading him into the commission of another, on the trial of which all the palliating circumstances heretofore mentioned were excluded from the consideration of the jury, and for which he must undergo a long term of imprisonment. I can not give this result my approval.