ROBERT LOUIS STEVENSON, JR. AND KENT
ALTON WILSON v. STATE OF MARYLAND

[No. 82, September Term, 1979.]

*Decided May 6, 1980.*

The cause was argued and reargued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

Argued and reargued by *Geraldine Kenney Sweeney, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

Argued and reargued by *Alexander L. Cummings, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

Petitioners Robert Louis Stevenson, Jr. and Kent Alton Wilson were convicted by a jury in the Circuit Court for Prince George's County of two counts of robbery with a deadly weapon and one count of using a handgun in the commission of a crime of violence. When on appeal the intermediate appellate court affirmed these convictions, this Court granted certiorari to review the following questions:

(1) Whether the Court of Special Appeals erred in holding that "a citizen's arrest" (in this case, police

officers acting outside of their territorial jurisdiction) were beyond the scope of constitutional protection?

(2) Whether the trial court erred in holding that the warrantless arrests of Stevenson and Wilson by private individuals were valid, and thus, that the fruits of these arrests were properly admitted into evidence?

Since we conclude that "citizens' arrests" remain viable in this State, and because we determine that the apprehension of petitioners here was validly effectuated in accord with longstanding common law principles for such arrests, we will affirm their convictions. By so ruling, we do not reach the constitutional issue posed.

The factual backdrop to this appeal begins with the daytime robbery, on April 4, 1978, of a branch of the First National Bank of Southern Maryland, located in the Marlow Heights Shopping Center in Prince George's County. Several males, some of whom were armed, entered the bank, seized all of the money contained in two of the tellers' cash drawers and immediately left on foot. At this same time, three members of the Washington, D.C. Metropolitan Police Department — Detectives Franklin, Bartholomew and Wallace — happened to be in the vicinity of the bank on totally unrelated business. As they approached the shopping center in an unmarked police car, Officer Franklin, who was familiar with the Marlow Heights area of southern Prince George's County, observed two men, approximately forty or fifty yards from the rear of the bank, running away from the building "as fast as they could." Specifically, the detective

noticed a cloud of paint or red smoke. Two men were in the cloud running. One of them had what appeared to be a bag in his hand that the smoke appeared to be coming from, and there were bits of paper flying through the air, coming out of the bag.

Being "familiar with the practice of banks using a [robbery prevention and detection] device that contains tear

gas and dye that they include among [the] money . . ., that explodes shortly after . . . it is removed from a [teller's] drawer," and seeing no apparent reason for the two men's flight as no one was chasing them, Franklin remarked to his companions that "there must be a bank robbery and those two possibly were part of it." The officers immediately made a U-turn, pulled their automobile abreast of the runners, verbally identified themselves as police officers (they did not display their badges nor were they in uniform) and directed the fleeing suspects to halt. When these two individuals failed to stop, Detectives Franklin and Bartholomew jumped from the car and gave chase. The runners separated, and one of them, later identified as petitioner Wilson, was almost immediately apprehended by Detective Franklin, with some assistance from Detective Bartholomew.

Seeing that his colleague had subdued Wilson, Officer Bartholomew pursued the second suspect. As this detective started up the street in the direction of the man's flight, he saw someone, "[a]pproximately a block or half a block" from where he had last seen Wilson and his companion before they had separated, who "broke and ran across the street." Officer Bartholomew believed this person was one of the two men he had seen running earlier, since his height (6'1" or 6'2") was about the same,[1] although the officer acknowledged having taken his eyes off of the runner for "a few seconds" while he helped corner Wilson. The detective also testified that he recalled seeing no one else on the street at the time he gave chase to this individual. Officer Bartholomew pursued this suspect around the corner of an office building, but he was nowhere to be seen; a search of the parking lot behind the building was then immediately undertaken by the detective since he "knew that [the runner] couldn't have disappeared that fast." When this search failed, Officer Bartholomew questioned "some

---

1. Bartholomew also testified that the clothing worn by this man was the same as the clothing of the second subject he had earlier seen running in the parking lot. However, he later indicated, on cross-examination, that his attention was drawn to this individual solely because of the similarity in height with the earlier runner.

unknown citizens" (who were, at the same time, eating at an outdoor cafe next to the parking lot) as to whether they had seen anyone running. One or more of these diners responded, "Yes, he is in the bushes up there by that car." Upon examining the bushes indicated, the officer found the suspect whom he had chased around the building lying prone on the ground camouflaged beneath the foliage. This man, later identified as petitioner Stevenson, was ordered out of the bushes and turned over to a Prince George's County police officer who, in response to the robbery alarm, had arrived on the scene. Stevenson, as well as Wilson, were subsequently indicted by the grand jury for robbery with a deadly weapon and related offenses.

At their jury trial in the Circuit Court for Prince George's County, both Stevenson and Wilson, each claiming that his arrest by the District of Columbia officers was illegal, moved to suppress all evidence concerning the arrest, including any in-court identification of him by Detectives Franklin and Bartholomew. A hearing was conducted on these motions, at which the events surrounding the arrests, earlier described, were related. The trial court, relying on this Court's decision in *Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 261 A.2d 731 (1970), denied the petitioners' motions to suppress because, in its view, the Washington officers, acting as private individuals, had the necessary probable cause to authorize a citizen's arrest. On appeal to the Court of Special Appeals, petitioners made no constitutional attack concerning their arrest, but challenged their capture solely on the grounds that, under our decision in *Paul,* a private individual may arrest another only if he possessed actual knowledge that a felony had been committed and not, as the trial court held, probable cause to believe that such criminal conduct had taken place. The intermediate appellate court, however, at the suggestion of the State, found it unnecessary to address the limited issue raised by the petitioners both before it and the trial court, since, in its view, citizens' arrests are not governed by the federal constitution's fourth amendment stricture against unreasonable searches and seizures. Consequently, that court affirmed the convictions

because, under this ruling, the exclusionary command of *Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) as a sanction for unconstitutional seizures, would not apply to the evidence obtained during the arrests of petitioners even if such detentions were illegally made. *Stevenson v. State,* 43 Md. App. 120, 124, 403 A.2d 812, 815 (1979). Because we conclude that these arrests made by the citizens here were valid under the nonconstitutional law of this State, whose requirements are at least as strict as those of the United States Constitution, there is no reason to consider the impact of the fourth amendment's exclusionary rule on arrests by private individuals.[2]

In explaining why we believe the apprehension of both Stevenson and Wilson by the District of Columbia detectives was valid, we begin by examining the status of these officers when they acted in this case. Generally, a peace officer's authority to make an arrest is limited, in the absence of statutory authority expanding it, to the confines of the geographical unit of which he is an officer. *See Gattus v. State,* 204 Md. 589, 597-600, 105 A.2d 661, 664-66 (1954); *accord, State v. Shienle,* 218 Kan. 637, 545 P.2d 1129, 1132 (1976); *Berigan v. State,* 2 Md. App. 666, 668-69, 236 A.2d 743, 744 (1968); *State v. Williams,* 136 N.J. Super. 544, 347 A.2d 33, 35 (1975); *Irwin v. State, Department of Motor Vehicles,* 10 Wash. App. 369, 517 P.2d 619, 621 (1974); 4 *Wharton's Criminal Law and Procedure* § 1614, at 277 (R. Anderson ed. 1957). At common law, a limited exception to this rule developed which permits an officer who is in "fresh pursuit" of a suspected felon to make a legally binding arrest in a territorial jurisdiction other than the one in which he has been appointed to act, *Gattus v. State, supra,* 204 Md. at 600-01, 105 A.2d at 666, and this ancient doctrine has, to some extent, been codified in this State. Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, §§ 595-602 (interstate fresh pursuit); §§ 602A-602AD (intrastate fresh

---

2. Our failure to address this constitutional query is in accord with the prevailing view, both within and without this State, that such issues should ordinarily be reached only when nonconstitutional questions have been exhausted without a resolution of the dispute. This is particularly true where, as here, the constitutional issue has neither been raised nor addressed by the aggrieved party in the trial court or on appeal.

pursuit). *See Boddie and Brooks v. State,* 6 Md. App. 523, 531, 252 A.2d 290, 293-94, *cert. denied,* 255 Md. 739 (1969). In all other situations, however, a peace officer who makes an arrest while in another jurisdiction does so as a private person, and may only act beyond his bailiwick to the extent that the law of the place of arrest authorizes such individuals to do so. *E.g., Davis v. United States,* 409 F.2d 1095, 1099 (5th Cir. 1969); *State v. McCullar,* 110 Ariz. 427, 520 P.2d 299, 300 (1974); *People v. Lyons,* 18 Cal. App. 3d 760, 96 Cal. Rptr. 76, 85 (1971); *State v. Shipman,* 370 So. 2d 1195, 1196 (Fla. App. 1979); *State v. O'Kelly,* 211 N.W.2d 589, 595 (Iowa 1973), *cert. denied,* 417 U.S. 936 (1974); *State v. MacDonald,* 260 N.W.2d 626, 627 (S.D. 1977); *Restatement (Second) of Torts* § 121, comment a (1965). In the present case, since Officers Franklin and Bartholomew were not in "fresh pursuit" of the petitioners at the time they arrested them in Prince George's County but were in the county on other business, they no longer had authority to arrest as police officers. Consequently, their acts must be examined as those of private citizens for, as the Iowa Supreme Court said in a similar situation: "When the [Nebraska] officers came to Iowa, they ceased to be officers but they did not cease to be persons. 'An officer who seeks to make an arrest without warrant outside his territory must be treated as a private person.'" *State v. O'Kelly, supra,* 211 N.W.2d at 595 (quoting 5 Am. Jur. 2d, *Arrest* § 50, at 742).

Although seemingly recognizing that police officers may not legally act in that capacity outside of the jurisdictional territory of their designating agency, petitioners, nonetheless, contend that such an officer is not necessarily to be viewed as other private citizens. Relying principally on an opinion by a Florida intermediate appellate court panel, *State v. Shipman,* 370 So. 2d 1195 (Fla. App. 1979), Stevenson and Wilson argue that an extraterritorial arrest by a peace officer is not that of a private citizen if the officer was acting "under color of his office" at the time he made the arrest. See also, *State v. Crum,* 323 So. 2d 673 (Fla. App. 1975) (per curiam); *Collins v. State,* 143 So. 2d 700 (Fla. App. 1962). Consequently, as the argument goes, since the

District of Columbia detectives identified themselves as police officers and used their service revolvers when apprehending petitioners, these arrests should not be viewed as those made by private individuals, although it is not entirely clear how petitioners would have us examine the validity of their arrests. Even if this Court were inclined to accept the legal principle announced by the Florida intermediate appellate court, we do not believe the activity challenged here would fall within it. A fair reading of these Florida precedents leads us to the conclusion that the phrase "color of his office" applies not to the modus operandi of the arrest, but to whether their official authority was used to gain access to the information which led to the belief that an arrest should be made. *Compare State v. Collins, supra* (officer admitted to a room *solely* because of his status as a peace officer where he observed commission of crime is acting under "color of his office") *with State v. Shipman, supra* (undercover agent who participates in narcotics transaction not acting under "color of his office" at time of arrest but as private citizen). Here, the Washington detectives did not see the cloud of red smoke or the flight of petitioners because of their status as officers; they merely observed what every private citizen, close enough to do so, could have perceived. Thus, we hold, as did both the trial court and Court of Special Appeals, that, under the circumstances present here, the District of Columbia police officers were functioning in a private rather than official capacity for the purpose of evaluating the legality of the arrests here.[3]

Having decided that the Washington detectives were acting as private individuals at the time they arrested the petitioners, we now turn to a discussion of the scope of a private citizen's legal authority to apprehend another for criminal activity, and whether that power was validly exercised in this case. Unlike many of our sister states, the law of arrest in Maryland is, for the most part,

---

3. This statement should not be read as an endorsement of the Court of Special Appeals' conclusion that, for fourth amendment purposes, there is no "state action" involved whenever a private person makes an arrest. We do not reach that issue.

governed by the common law rather than by statute.[4] *See Kauffman, The Law of Arrest in Maryland,* 5 Md. L. Rev. 125, 125-26 (1941). Under the common law, as we inherited it from England (*see* Md. Decl. of Rts., Art. 5), both peace officers, as well as private individuals, have the right to arrest those suspected of crime, with the extent of their authority depending upon the specific type of arrest made. *See, e.g.,* M. Bassiouni, *Citizen's Arrest* 9-13 (1977); 2 M. Hale, *The History of the Pleas of the Crown* 72-97 (1st Am. ed. 1847); 2 W. Hawkins, *A Treatise of the Pleas of the Crown* 114-29 (8th ed. 1824). *See generally,* Annot., 7 British Ruling Cases 679 (1918); *Kauffman, supra.* While the right of private individuals to arrest those suspected of criminal activity is one of longstanding in Anglo-American legal history,[5] this Court has, on only a few occasions, addressed this aspect of law enforcement in this State. *See Great Atl. & Pac. Tea Co. v. Paul,* 256 Md. 643, 261 A.2d 731 (1970); *B. & O. R.R. Co. v. Cain,* 81 Md. 87, 31 A. 801 (1895). A decade ago, when we last examined this area of law, we tersely set

---

4. In recent years, the General Assembly has begun to codify aspects of the law of arrest in this State. See Md. Code (1957, 1976 Repl. Vol., 1979 Cum. Supp.), Art. 27, § 594B (arrest without a warrant by police officers); § 594C (arrest without a warrant by certain private individuals in times of public emergency); and § 7-207 of the Transportation Article, Md. Code (1977) (security forces of the Mass Transit Administration have the powers of police officers). However, none of these sections is relevant to the present case.

5. The right of private citizens to make arrests has its roots in the Statute of Winchester, enacted in 1285. 13 Edw. I., st. 2, c. 1 & 2 (1285). M. Bassiouni, *Citizen's Arrest* 9 (1977); Wilgus, *Arrest without a Warrant,* 22 Mich. L. Rev. 541, 545-47 (1922). This statute not only established the right of every person to apprehend malefactors in order to preserve the King's peace, but also imposed a positive duty on the people of England to drop whatever they were doing when the "hue and cry" was raised and to "join immediately in the pursuit." M. Bassiouni, *supra,* at 9. Professor Wilgus vividly describes this early method of law enforcement:

> When the cry of Out! Out! is heard, all must turn out with bows, arrows, knives, and shout and blow horns, from vill to vill . . . . The handhaving thief, or the red handed slayer with the gory knife in his hand, taken in hot pursuit, by those following the *hue and cry,* was still summarily disposed of; or if brought before any court was summarily hanged or beheaded, on proof that he was taken under hue and cry, without any formal appeal or charge against him. [Wilgus, *supra,* 22 Mich. L. Rev. at 545.]

This differs little from what has been referred to in this country as lynch law. Wilgus, *supra,* 22 Mich L. Rev. at 546.

forth the common law requirements for a valid citizen's arrest:

> In Maryland a private person has authority to arrest without a warrant only when a) there is a felony being committed in his presence or when a felony has in fact been committed whether or not in his presence, and the arrester has reasonable ground (probable cause) to believe the person he arrests has committed it; or b) a misdemeanor is being committed in the presence or view of the arrester which amounts to a breach of the peace. Kauffman, *The Law of Arrest in Maryland,* 5 Md. L. Rev. 125, 155 (1941); 49 Op. Atty. Gen. 11 (1964). [*Great Atl. & Pac. Tea Co. v. Paul, supra,* at 655, 261 A.2d at 738-39.]

*Accord, B. & O. R.R. Co. v. Cain, supra,* at 102, 31 A. at 804. Although minimal authority was cited in support of this standard, it does accurately portray the law on this subject which is generally accepted both in this country and in England since at least the late eighteenth century. *See, e.g., United States v. Coplon,* 185 F.2d 629, 634 (2nd Cir. 1950); *Davis v. United States,* 16 App. D.C. 442, 454-55 (1900); *Suell v. Derricott,* 161 Ala. 259, 49 So. 895, 901 (1909); *Smith v. State,* 258 Ind. 594, 283 N.E.2d 365, 367 (1972); *State v. Albright,* 144 Mo. 638, 46 S.W. 620, 621-22 (Mo. 1898); *Brown v. State,* 62 N.J. Law 666, 42 A. 811, 820 (1899); *Holley v. Mix,* 3 Wend. 350, 353-54 (N.Y. Sup. Ct. 1829); *Brooks v. Commonwealth,* 61 Pa. 352, 358-59 (1869); *Walters v. Smith & Son,* [1914] 1 K. B. 595, 674-75; *Davis v. Russell,* 5 Bing. 354, 363-64, 366 (C.P. 1829); *Beckwith v. Philby,* 9 Dowl. & Ry. 487, 490 (K.B. 1827); 2 M. Hale, *supra,* at 75-79; L. Hockheimer, *A Manual of American Criminal Law* § 120 (1911); A.L.I., *Code of Criminal Procedure* § 22, at 238-42 (1930); Perkins, *The Law of Arrest,* 25 Ia. L. Rev. 227, 233-40 (1940); Annot., *Arrest by Private Person,* 133 A.L.R. 608, 613-19 (1941); Annot., *Right of Private Person to Make or Cause Arrest without Warrant,* 7 British Ruling Cases 679, 682-83 (1918). In the case we now consider,

therefore, the question of primary importance is how the tenets of the private person (citizen) arrest rule expressed in *Paul* are to be interpreted and applied.

Given the undisputed premise that the crime for which Stevenson and Wilson were arrested (bank robbery) is a felony, their arrests are valid under the *Paul* test if either of two sets of conditions were present at the time of their capture: (1) The robbery for which the petitioners were arrested was being committed in the presence of their captors; or (2) that crime, although not occurring in the presence of Officers Franklin and Bartholomew, in fact happened, and reasonable grounds existed for the belief that the petitioners had committed the suspected offense. Not surprisingly, the parties disagree as to the impact of each of these legal requirements as they apply in the present case. With respect to the first possibility, it is petitioners' contention that since the District of Columbia detectives did not view the robbery itself, i.e., the actual taking possession of the money, but merely observed, after the fact, circumstantial evidence of it having been committed, their apprehension cannot be upheld as complying with this aspect of *Paul.* The State answers, however, that since the crime was still in progress at the time the officers passed the shopping center, the felony was being committed in their presence and they had the right (and maybe even the duty, *see* 2 W. Blackstone, *Commentaries* \* 292-93) to arrest the petitioners. In support of this argument the Attorney General relies on the fact that if Wilson or Stevenson had shot and killed either of their arresters, they would have been, in his view, guilty of murder perpetrated in the commission of a felony (felony-murder), which must mean that the felonious act had not yet terminated at the time the Washington detectives came upon the scene. *Cf. Veney v. State,* 251 Md. 159, 174-75, 246 A.2d 608, 617-18 (1968), *cert. denied,* 394 U.S. 948 (1969); *Mumford v. State,* 19 Md. App. 640, 643-44, 313 A.2d 563, 566 (1974); *Jeter v. State,* 9 Md. App. 575, 579-80, 267 A.2d 319, 321-22 (1970), *aff'd,* 261 Md. 221, 274 A.2d 337 (1971). Considering the time and space proximity present in this case between the obtaining

possession of the money and the observed flight of the suspects, we do not deem it a frivolous argument to suggest, as does the State here, that the commission of the crime was still in progress when observed by the detectives so as to be committed in their presence. *See* Perkins, *supra,* 25 Ia. L. Rev. at 231-33. However, we find it unnecessary to explore this aspect of the common law of arrest because we believe the State is clearly correct in its interpretation of the second prong of the *Paul* rule — that all that is required, in the criminal context, to authorize a valid citizen's arrest is reasonable grounds to believe (i) that a felony had been committed and (ii) that the petitioners were the responsible agents; not as the petitioners contend, that the officers have actual knowledge of its commission. In the present case, this aspect of the dispute centers around the language in *Paul* and other decisions requiring proof that "a felony has in fact been committed" in order to justify an arrest by a private individual. Petitioners assert that this requires *actual knowledge* by the arresting party of the felony's commission at the time he decides to arrest. *See People v. Aldapa,* 17 Cal. App. 3d 184, 94 Cal. Rptr. 579 (1971). *But see Smith v. State,* 258 Ind. 594, 283 N.E. 2d 365, 367 (1972). The State, on the other hand, maintains that the "in fact been committed" aspect of the common law is only a condition for protecting the arrester from possible civil or criminal prosecution if he has made a mistake of fact with respect to the arrestee's guilt.

In explaining our agreement with the State's position, we initially point out that what we have just said concerning the right of arrest by a private individual is similar to the well-settled common law standard for warrantless felony arrests by police officers. *E.g., United States v. Watson,* 423 U.S. 411, 417-418, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976); *Drouin v. State,* 222 Md. 271, 278, 160 A.2d 85, 88 (1960); *Kirk & Son v. Garrett,* 84 Md. 383, 405, 35 A. 1089, 1091 (1896); 2 W. La Fave, *Search and Seizure — A Treatise on the Fourth Amendment* § 5.1, at 222 (1978). For a recent discussion of the common law of warrantless felony arrests by police officers, *see Payton v. New York,* 445 U.S. 573,

591-98, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). While phrased in terms of "reasonable grounds" for arrest, this common law criterion also happens to state the constitutional standard, since it and the "probable cause" requirement of the federal constitution's fourth amendment "are substantial equivalents." *Henry v. United States,* 361 U.S. 98, 100, 80 S. Ct. 168, 4 L. Ed. 2d 134 (1959); *Draper v. United States,* 358 U.S. 307, 310 n. 3, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); 2 W. La Fave, *supra,* § 5.1, at 222-23. Consequently, the use of such a measure for deciding the validity of a citizen's arrest will provide the same protection as that encompassed by the constitution when the state is actively involved in the arrest.

Turning next to the common law itself, we find that its historical development with respect to warrantless felony arrests by private individuals is supportive of our position here that, as applied in criminal cases, such arrests are validly made if reasonable grounds exist to believe that a felony has been committed and that the person being apprehended has committed it. We should note for the reader, however, that

> the common-law rules of arrest developed in legal contexts that substantially differ from the case[ ] now before us. ... At common law, the question whether an arrest was authorized typically arose in civil damage actions for trespass or false arrest, in which [an arrester's] authority to make the arrest was a defense. See, *e.g., Leach v. Three of the King's Messengers,* 19 How. St. Tr. 1001 (K.B. 1765). Additionally, if an [arrester] was killed while attempting to effect an arrest, the question whether the person resisting the arrest was guilty of murder or manslaughter turned on whether the [arrester] was acting within bounds of his authority. See M. Foster, Crown Cases 308, 312 (1762). See also *West v. Cabell,* 153 U.S. 78, 85. [*Payton v. New York, supra,* 445 U.S. at 591-92.]

Having made these observations, we now explore the development of the common law with respect to arrests.

During the formative years of the law of arrest, the apprehension of criminals by private individuals was the norm rather than the exception as it is today. While "[t]he Crown appointed sheriffs and constables among whose manifold duties was that of arresting wrongdoers, ... the principal burden of keeping the peace lay on the community as a whole." Warner, *Investigating the Law of Arrest*, 31 J. Crim. L. C. & P. S. 111, 112 (1940). *Accord,* Hall, *Legal & Social Aspects of Arrest Without a Warrant,* 49 Harv. L. Rev. 566, 579 (1936).[6] As a result, for the first four to five hundred years of the law's development, the right of private persons to make arrests was equal in all respects with that of constables and other peace officers. Warner, *supra,* 31 J. Crim. L. C. & P. S. at 112; Hall, *supra,* 49 Harv. L. Rev. at 567-69. One common law treatise, first published in 1618, summarized the law of arrest in the following fashion:

> *Every private man may arrest another,* whom he knoweth or seeth to have committed a Robbery, Manslaughter, or other Felony, and may deliver him to the Constable of the Town where such an Offender is apprehended, or in the Constable's Absence may imprison and set ` him in the Stocks....
>
> Also when a Felony is committed, *every man may arrest suspicious Persons* that be of evil Frame, & c. and if such Person shall make Resistance, the other may justify to beat him.
>
> But for the Arresting of such suspicious Persons,

---

6. In this regard, see also the Statute of Winton, 28 Edw. III, c. 11 (1355) which read: "That immediately upon robberies and felonies committed, fresh suit shall be made from town to town; and if the country will not answer for the bodies of such offenders within the space of forty days, the inhabitants of the whole hundred where the robbery shall be done ... shall be answerable for the robberies done, and also for the damages." Quoted in 2 W. Hawkins, *A Treatise of the Pleas of the Crown,* 116 (8th ed. 1824). *See* n. 5 *supra.*

note, that there must be some Felony committed indeed.

\* \* \*

So that when any Felony is done, *every Man that shall suspect another to be guilty thereof may arrest him.*

*Any Man suspecting another of a Felony committed, or only intended, may arrest him. . . .*

\* \* \*

The Sheriff, Bailiff, Constables and the other King's Officers, may arrest and imprison Offenders *in all Cases where a private Person may. . . .* [M. Dalton, *The Country Justice* 407-08 (1746 ed.) (emphasis added).]

*Accord,* 2 W. Hawkins, *A Treatise of the Pleas of the Crown* 80 (1721) ("it seems difficult to find any case, wherein a Constable is impowered to arrest a Man for a Felony committed or attempted, in which a private Person might not as well be justified in doing it"); *See Sir Anthony Ashley's Case,* 12 Coke * 90, 92 (1612). In essence, at this early time, both private and official persons were permitted to arrest others on the basis of reasonable grounds of suspicion that a felony has occurred and that the person arrested has committed it, but all persons, be he citizen or officer, acted at their peril for "if no felony has been committed, the apprehension of a person suspected cannot be justified by any body" and the arrester will be answerable in damages. *Samuel v. Payne,* 1 Doug. 359, 360 (K. B. 1780) (Mansfield, J.).[7]

With the advent of police forces, as we today know them,

---

7. For its historical value, we note that during the time of Henry IV it was argued in the court, that arrests on the basis of reasonable cause would be sufficient justification in an action for damages even though no felony were committed; the case was adjourned, however, before decision. Y. B. Pasch. 7 Hen. 435, pl. 3 (1406). *See* Samuel v. Payne, 1 Doug. 359, 360 (K. B. 1780) (reporter's note); Annot., 7 British Ruling Cases 679, 685 n. 15 (1918).

in the late eighteenth and early nineteenth centuries, *see* Hall, *supra,* 49 Harv. L. Rev. at 580-83, came a corresponding change in the principles of arrest. The primary vehicle of that change was a decision by Lord Mansfield in the case of *Samuel v. Payne, supra.* In that case, involving a civil suit against a police officer for arresting an innocent person, the court, recognizing that officers have a *duty* to arrest suspected persons and could be liable for damages for failing to do so, held that when an arrest is made by such a person, it is justified and the officer is not liable for damages if done so on the officer's reasonable belief that a felony has occurred and this person was somehow involved, even if it was later discovered that no felony in fact took place. As later English decisions would describe the law of arrest in the wake of *Samuel v. Payne*:

> There is this distinction between the case of a constable and a private individual. The private individual must not only show a reasonable cause for suspicion, but he must prove that a felony has been actually committed, in order to justify the detention of the party; whereas a constable, who has reasonable ground to suspect that a felony has been committed, is authorized to detain the party suspected. . . . [*Beckwith v. Philby,* 9 Dowl. & Ry. 487, 490 (K. B. 1827) (Tenterden, C. J.).]

*See Davis v. Russell,* 5 Bing. 354, 363-64 (C.P. 1829) (Best, C. J.). On this side of the Atlantic, the difference between private and public individuals power of arrest was described in this way:

> The felon who is seen to commit murder or robbery must be arrested on the spot or suffered to escape. So, although not seen, yet if known to have committed a felony, and pursued without warrant, he may be arrested by any person. *And even when there is only probable cause of suspicion, a private person may without warrant, at his peril, make an arrest.* [*Wakley v. Hart,* 6 Binn. 316, 318-19 (Pa. 1814) (emphasis added).]

See, e.g., State v. Holmes, 48 N.H. 377, 378 (1869); Burns v. Erben, 1 Hand 463, 468-69 (N.Y. 1869); Holley v. Mix, 3 Wend. 350, 353 (N.Y. Sup. Ct. 1829). See also 1 J. Bishop, New Criminal Procedure §§ 168, 181 (2d ed. 1913). As may be seen from the background history which precipitated these decisions, the common law did not add an additional requirement to the law of arrest by private individuals, but was protecting the peace officers of the society from mistakes of fact; consequently, when decisions such as Paul speak of a felony "in fact being committed", they are indicating that the citizen, unlike the police officer, may be exposed to civil or criminal prosecution if it later turns out that the person arrested was innocent and the arrester was not able to show that an appropriate crime in fact had been committed. We, therefore, conclude that a private person may make an arrest if he had reasonable grounds (probable cause) to believe that a felony was committed and that the person whom he arrests committed it. Accord, Jack v. Rhay, 366 F.2d 191, 192 (9th Cir. 1966) (per curiam); Nash v. State, 207 So.2d 104, 106-7 (Miss. 1968); M. Bassiouni, supra, at 26.

Before applying these principles to the facts of the present case, we should address briefly the petitioners' contention that the law governing arrest by citizens is outmoded in today's world and should be stricter than that which permits arrests by police officials, in order to discourage interference with other people's liberty, and because of the danger involved in apprehending felons. First of all, we doubt that the average citizen will become anymore involved in law enforcement activities than he presently is merely because he may arrest on the basis of probable cause. Secondly, the fact that a private person acts at his peril when he arrests another is, in our view, a sufficient deterrent to unwarranted interference with other people's liberty. Moreover, placing greater obstacles in the path of citizens who wish to aid society may, in the end, prove to be detrimental to the maintenance of peace and good order in the community. In the words of our neighbors to the north from over a century ago:

It is also said that arrest by a private person is

contrary to the genius of our institutions, and is the relic of a barbarous age. But the reverse is the case in a republic, where the people themselves represent its sovereignty and its security. The felon is an enemy to the sovereignty and security, forfeits his liberty, and cannot complain that the hand of his fellow-man arrests his flight and returns him to justice. What title has he to immunity from the law which he has violated, and to be permitted to escape its penalties because the officer of justice is not at hand to seize him? He has broken the bond of society; he has dealt a blow at its welfare and security, and he has placed himself in open hostility to all its faithful members, whose duty it becomes to bring him to justice. [*Brooks v. Commonwealth,* 61 Pa. 352, 359 (1869).]

*Accord, Brockway v. Crawford,* 48 N.C. (3 Jones) 433, 438-39 (1856).

Turning to the evidence presented in this case, we find that Officers Franklin and Bartholomew had the requisite probable cause at the time of arrest. Probable cause for a warrantless arrest exists "where the facts and circumstances within the [arresting parties'] knowledge and of which they had reasonably trustworthy information are sufficient in themselves to [authorize] a man of reasonable caution in the belief that an offense has been committed" by the person arrested. *Edwards v. State,* 196 Md. 233, 237, 76 A.2d 132, 134 (1950). *See, e.g., Gilmore v. State,* 263 Md. 268, 275-76, 283 A.2d 371, 375-76 (1971), *modified,* 408 U.S. 940 (1972); *Walters v. State,* 242 Md. 235, 239, 218 A.2d 678, 681 (1966). "In dealing with probable cause . . ., as the very name implies, we deal with probabilities . . . . [T]hey are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States,* 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949).[8] With respect to petitioner Wilson's

---

8. We note that in a civil context, as opposed to a criminal one as in this case, that it is "well-settled that the existence of probable cause is a question to be determined as a matter of law by the court upon a given set

arrest, the following facts, taken together, support the finding that Officer Franklin acted with probable cause both as to the commission of the robbery and the arrestee's participation in the criminal act; (1) Detective Franklin's observation of Wilson and his confederate running in a cloud of red smoke, carrying a bag with bits of paper and smoke flying out of it; (2) his familiarity with the type of security devices used in banks (exploding red dye); and (3) his knowledge that a bank was located in the shopping center near the place where he first observed the men running. Consequently, we cannot say that a reasonably prudent person could not conclude that a felony had just been committed and that Wilson, who was apprehended moments after being sighted by Franklin, was involved in its commission.

The apprehension of petitioner Stevenson by Officer Bartholomew is also based on the requisite probable cause, although concededly not as firmly as the arrest of his confederate. Examining first Detective Bartholomew's knowledge concerning the commission of the robbery, we find that, although he did not possess the same personal familiarity with the vicinity or make the initial observations that Franklin did of the two men in the cloud of smoke, he still had probable cause to believe that a crime had been committed. As is the case with police arrests, citizens may also apprehend suspected felons on "information of facts derived from credible sources, or from persons reasonably presumed to know them, which if submitted to the judge or the magistrate . . ., would require the issue of a warrant of arrest." *Suell v. Derricott,* 161 Ala. 259, 49 So. 895, 901 (1909). *See* 2 M. Hale, *The History of the Pleas of the Crown* 80 (1st Am. ed. 1847). Here, reasonably trustworthy information was given to Bartholomew by a credible source; Franklin mentioned sighting the red smoke, indicated its significance in his opinion, and pointed to the two men running. Officer Bartholomew did not have to personally

---

of facts, but when the facts are disputed, the question may properly be submitted to the jury under adequate instructions." Montgomery Ward & Co. v. Cliser, 267 Md. 406, 416, 298 A.2d 16, 22 (1972).

know the significance of the cloud of red smoke (whether he did or did not is not disclosed by the record), but could rely on the conclusions of a trustworthy source, taking into account the source's background. *See Morrison v. United States,* 491 F.2d 344 (8th Cir. 1974) (defendant was arrested for passing counterfeit money, detected by a bartender who had previously worked in a bank and had training in the detection of counterfeit bills); *United States v. Unger,* 469 F.2d 1283 (7th Cir. 1972), *cert. denied,* 411 U.S. 920 (1973) (warrant obtained for stash of illegal weapons, based upon report of citizen who was able to describe them in detail because of his experience with weapons while in the ordnance section of the Army); *Patty v. Commonwealth,* 218 Va. 150, 235 S.E.2d 437 (1977), *cert. denied,* 434 U.S. 1010 (1978) (marijuana arrest based on information from youth who had seen and been instructed about substance in high school class). Thus, Bartholomew had probable cause to believe a felony had been committed. Whether he had probable cause to believe Stevenson committed it is somewhat less obvious because of the fact that he momentarily lost sight of the petitioner during the chase. As set forth earlier Detective Bartholomew testified that "for a few seconds" he was without sight of one of the men who had been running while he assisted in the apprehension of Wilson, but that when he "came back up the sidewalk . . . another subject broke . . . from about the same place where I last seen him [,Wilson's companion]." There was a similarity in height between the man he then saw and the one he saw earlier, as well as similarity in their clothing. Moreover, he recalled seeing no one else on the street. He again lost sight momentarily of him as he chased the fleeing man around an office building, but some citizens standing nearby observed where Stevenson had gone and told Officer Bartholomew, who then found petitioner laying beneath some bushes. Again we are convinced that, taken as a whole, these facts are sufficient basis for the belief by a reasonable person that Stevenson was one of the two men who had earlier been running in the "cloud of red smoke." Consequently, we hold that since, as private citizens, the

District of Columbia detectives had reasonable grounds to believe not only that a felony had occurred, but also that the petitioners had committed it, the arrests here are legal and the trial court properly denied the motions to suppress.

*Judgment of the Court of Special Appeals affirmed.*
*Costs to be paid by the petitioners.*