598 A.2d 762

**Najee Abdul BAITH, aka Tommy Lee Carter**

v.

**STATE of Maryland.**

**No. 1748, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Nov. 29, 1991.

Clarence W. Sharp, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty., for Prince George's County, Upper Marlboro, on the brief), for appellee.

Argued before MOYLAN, BISHOP and FISCHER, JJ.

MOYLAN, Judge.

In law, the difficulty is frequently not one of finding the right answer but one of asking the right question. We are here called upon to answer whether a police intrusion into a private building, possibly an office or possibly a home, was justified. For sake of argument, we will assume it to have been a home. It is impossible to provide an answer until a properly focused question pinpoints for us precisely what the intrusion was and when the intrusion occurred that calls for the justification.

The core value served by the Fourth Amendment, of course, is the protection of the "sacred threshold" of the home. *Michigan v. Clifford,* 464 U.S. 287, 296–297, 104 S.Ct. 641, 648–649, 78 L.Ed.2d 477, 486 (1984); *Welsh v. Wisconsin,* 466 U.S. 740, 748–749, 104 S.Ct. 2091, 2096–2097, 80 L.Ed.2d 732, 742 (1984). When a citizen withdraws into the sanctuary of the home, a governmental intrusion into that sanctuary, either to search for evidence or to arrest the homeowner, requires a high level of justification. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–455, 91

S.Ct. 2022, 2031–2032, 29 L.Ed.2d 564, 576 (1971); *Payton v. New York*, 445 U.S. 573, 583–590, 100 S.Ct. 1371, 1378–1382, 63 L.Ed.2d 639, 649–653 (1980). Where, on the other hand, the home has been debased by the homeowner himself into some sort of criminal emporium, its status as *sanctum sanctorum* is rudely diminished. The compromising agency in such a case is not the investigative opportunism of the police but the commercial trafficking of the occupant.

The doctrinal backdrop for our consideration of the primary contention in this case is *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 427–428, 17 L.Ed.2d 312, 316 (1986):

> "Without question, the home is accorded the full range of Fourth Amendment protections.... But when, as here, the home is converted into a commercial center to which outsiders are invited for purposes of transacting unlawful business, that business is entitled to no greater sanctity than if it were carried on in a store, a garage, a car, or on the street. A government agent, in the same manner as a private person, may accept an invitation to do business and may enter upon the premises for the very purposes contemplated by the occupant." (citations omitted).

The appellant, Najee Abdul Baith, also known as Tommy Lee Carter, was no mere possessor or even small-time distributor of cocaine. He was a major player. For a four-month period in late 1989, the United States Drug Enforcement Agency expended significant effort to uncover and to amass proof of his criminality. That effort culminated in the appellant's conviction by a Prince George's County jury, presided over by Judge William D. Missouri, of possession of cocaine with intent to distribute and related charges. The appellant's primary contention is that his pretrial motion to suppress evidence warrantlessly seized from his building and from his person was erroneously denied.

The key government operative in this case was Barbara Walters, a confidential source who had been working with the DEA for at least five years. Ms. Walters worked the case in cooperation with and under the direction of DEA

Agent Judith Young. On at least fifteen prior occasions, Ms. Walters had provided the DEA with information leading to seizures of narcotics and to convictions. She had never provided erroneous information. She was always paid in cash immediately after any arrest that was made on the basis of her undercover operations. On one occasion, her compensation had been as high as $10,000. Following the appellant's arrest on December 15, 1989, Ms. Walters received payment in the amount of $1,500.

Barbara Walters had been a casual acquaintance of the appellant for approximately ten years before the beginning of this investigation. The appellant had once provided cocaine for a party hosted by her. In August of 1989, the appellant called Barbara Walters to tell her that he had access to cocaine in kilo lots that a friend needed to get rid of. She responded that she would get back to him if she could develop an interested purchaser. On December 12, Barbara Walters finally got back to the appellant and the two of them discussed her purchasing of a kilo of cocaine from him for a price of $27,000. During those negotiations, she was working closely with her DEA contacts and, at their direction, recorded her telephone conversations with the appellant. Approximately ten conversations were recorded on December 13, 14, and 15.

The appellant and Barbara Walters arranged a "meet" on December 14. The transfer of cash for cocaine was to take place at the Fisherman's Catch Restaurant, which was owned and had been operated by the appellant and Loomis Taylor but which was closed for business at that time. The "meet" that day aborted when Ms. Walters and DEA Agent Ingram, posing as her nephew, arrived late for the meeting. Barbara Walters paged the appellant later that day and they arranged for another meeting at the same place for noon on December 15.

The Fourth Amendment issue before us revolves about the happenings of December 15. Barbara Walters was again driven to the meeting site by Agent Ingram, who remained parked across the street as Ms. Walters went into

the Fisherman's Catch Restaurant. Between ten and fifteen DEA Agents and Prince George's County police officers were deployed throughout the general area. As Ms. Walters approached the restaurant, she saw Loomis Taylor, the appellant's partner, arriving simultaneously. The two greeted each other and went upstairs to the office to wait for the appellant. A few minutes later, Taylor went downstairs to call the appellant, presumably to tell him that the "meet" was on and that he could bring the cocaine to the rendezvous. Ms. Walters, ostensibly checking with her own backup, walked over to the parked car to report to Agent Ingram. Walters and Taylor both then reentered the building.

From the various surveillance points, a number of agents observed the appellant arrive ten minutes later carrying an attache case. He carried this to the upstairs office. He told Ms. Walters that he had the "coke" and showed her a brick of cocaine in the attache case. She stuck her hand in to taste the cocaine and pronounced it "OK." She indicated to the appellant that she had the money in the car. She and the appellant then walked downstairs together and he waited just inside the door as she went to the car and received an empty bag from Agent Ingram. She passed the word to Ingram that the deal was in progress and that the cocaine was sitting in the attache case on the desk upstairs. Ms. Walters, now accompanied by Agent Young and Agent Ronald Kahn, went back to the door of the building and rapped on it. As the appellant opened the door to let her in, the agents rushed the building.

The appellant himself was arrested as he stood, half in and half out of the doorway. He immediately began shaking and fell to the ground in some sort of seizure. Paramedics were soon upon the scene. In the meantime, a small plastic bag containing white powder was seen protruding from out of the appellant's pants leg as he lay upon the ground. It contained three packages of cocaine, weighing 15.2 grams, 23.3 grams, and 19.3 grams, respectively. At the suppression hearing, there was a great deal of

"fuss" as to whether the appellant was arrested inside the building or outside the building and what significance the answer to that question might have in terms of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). (Even King Solomon might have been perplexed by this one, for the facts permitted the conclusion that the lower half of his body was in but the upper half was out. Where, according to the philosophers, does the quintessence of a person reside?)

Meanwhile, other DEA agents had raced upstairs. Agent Young knew that the appellant owned a gun. Agents Young and Kevin Tamez both testified that they knew that Loomis Taylor was still at large somewhere in the building and that they were concerned for their safety. Agent Tamez also testified that it would have been easy for Taylor or another to flush the drugs down a toilet. Agent Tamez found the large quantity of cocaine sitting on the desk in the upstairs room. He went to an adjoining room, where he located and arrested Taylor. The appellant in the meantime had recovered from his seizure and was asked to consent to a search of the premises. He ostensibly consented. The cocaine found in the building was seized. It weighed 1,041 grams and had a purity of 51%.

The suppression hearing and the appeal thus far, both on brief and in argument, have produced a mind-boggling tangle of intertwining and overlapping Fourth Amendment questions and theories. Was the police search of the building pursuant to the appellant's voluntary consent? *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Was the voluntariness of the consent, in turn, contingent upon the constitutionality of the antecedent police seizure of the appellant's person? *Florida v. Bostick*, 500 U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Is an arrest inside a building for a crime then in progress an exemption from the arrest warrant requirement of *Payton v. New York?* Was the seizure from the

appellant's pants leg an incident to lawful arrest? *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Was the warrantless rush into the building justified by exigent or emergency circumstances? *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). May the imminent loss of evidence constitute such an exigent circumstance? *Welsh v. Wisconsin*, 466 U.S. 740, 753–754, 104 S.Ct. 2091, 2099–2100, 80 L.Ed.2d 732, 745–746 (1984); *Vale v. Louisiana*, 399 U.S. 30, 35, 90 S.Ct. 1969, 1972–1973, 26 L.Ed.2d 409, 413–414 (1970); *Ker v. California*, 374 U.S. 23, 37–41, 83 S.Ct. 1623, 1631–1634, 10 L.Ed.2d 726, 740–742 (1963); *cf. Schmerber v. California*, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908, 919–920 (1966).

Was the evidence seized under the Plain View Doctrine? *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). For purposes of the Plain View Doctrine, was the necessary prior valid intrusion the protective sweep of the building for the appellant's potentially armed accomplice? *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). May a protective sweep ever be predicated upon a warrantless arrest as opposed to *Maryland v. Buie*'s arrest with a warrant? May a protective sweep ever be predicated upon an arrest just outside the building as opposed to *Maryland v. Buie*'s arrest inside a building? May a protective sweep ever be predicated upon an arrest that straddles the threshold of the building? How about an arrest outside a building but within its curtilage? Does a building other than a home even have a curtilage? *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). What effect might a curtilage have on the applicability of *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)? Upon *Maryland v. Buie?* The legal tangle was truly a Gordian knot. The Gordian knot, however, resulted from an attempt to

answer the wrong question. It was a question that inquired about the wrong entry at the wrong time.

■ The critical police intrusion into the appellant's constitutionally protected zone of privacy occurred when the police agent, Barbara Walters, by prior arrangement with the appellant and with the immediate consent of Loomis Taylor, first entered the building. That was the significant moment when the appellant's privacy was breached. In full view of the police agent whom he had incautiously invited in, the appellant spread out a kilo of cocaine before her, asked her to taste it to confirm its genuineness, and then demanded his asking price of $27,000. With the full acquiescence of the appellant and Loomis Taylor, Barbara Walters twice left the building to make brief trips to her automobile and her companion with the full expectation that she would immediately reenter. The invitation or consent for Barbara Walters to enter extended as well to her reentries. Each reentry was not an independent constitutional phenomenon calling for independent justification but was simply a continuation of the initial entry. *Michigan v. Tyler*, 436 U.S. 499, 510–511, 98 S.Ct. 1942, 1950–1951, 56 L.Ed.2d 486, 499 (1978) ("[T]he morning entries were no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence.") When a police agent, by artful deception, insinuates herself into the criminal inner sanctum, that is the entry that calls for constitutional analysis, not the eleventh-hour arrival of the reinforcements once the undercover agent manages to send the signal that the crime is in progress.

That Barbara Walters, under the guise of retrieving the purchase money from the car, was able to slip out momentarily to give the signal presents a situation no different than if she had given the same signal from the upstairs room by going to the window and raising and lowering the blind. Would the appellant maintain that the rest of the police team could not then have rushed to her support? Once a

police agent observes a crime being committed in her presence,[1] the timely arrival of the backup units is simply an incident of that primary investigative phenomenon and does not call for separate and incremental justification.

As to the justification for the entry of Barbara Walters herself into the constitutionally protected area, *Lewis v. United States*, 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312, 315–316 (1966) is dispositive:

> "In the instant case, ... the petitioner invited the undercover agent to his home for the specific purpose of executing a felonious sale of narcotics. Petitioner's only concern was whether the agent was a willing purchaser who could pay the agreed price.... During neither of his visits to petitioner's home did the agent see, hear, or take anything that was not contemplated, and in fact intended, by petitioner as a necessary part of his illegal business. Were we to hold the deceptions of the agent in this case constitutionally prohibited, we would come near to a rule that the use of undercover agents in any manner is virtually unconstitutional per se. Such a rule would, for example, severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest. A prime example is provided by the narcotics traffic." (footnote omitted).

---

**1.** The status of the observer of the crime as a cooperating civilian, on the one hand, or an official police officer, on the other hand, has no bearing on the observer's legal competence to trigger the arrest scenario (the raid including the arrest of all guilty parties and the processing of the crime scene). The official police officer, of course, would have authority then and there to make a lawful arrest for a felony committed in his presence. So too, however, would the civilian. The decision by either to move out of harm's way and to blow the whistle summoning armed reinforcements is a purely tactical maneuver. As to the arrest power of a private citizen, *Stevenson v. State*, 287 Md. 504, 513, 413 A.2d 1340, 1345 (1980) is clear:

> "In Maryland a private person has authority to arrest without a warrant ... when ... there is a felony being committed in his presence."

Especially in dealing with crimes like narcotics trafficking, the use of undercover agents and deception is fully countenanced:

"Particularly, in the enforcement of vice, liquor or narcotics laws, it is all but impossible to obtain evidence for prosecution save by the use of decoys. There are rarely complaining witnesses. The participants in the crime enjoy themselves. Misrepresentation by a police officer or agent concerning the identity of the purchaser of illegal narcotics is a practical necessity."

385 U.S. at 210 n. 6, 17 L.Ed.2d at 316 n. 6.

With respect to the breach of the appellant's privacy accomplished by the ruse in this case, we conclude, as did the Supreme Court in *Lewis:*

"In short, this case involves the exercise of no governmental power to intrude upon protected premises; the visitor was invited and willingly admitted by the suspect. It concerns no design on the part of a government agent to observe or hear what was happening in the privacy of a home; the suspect chose the location where the transaction took place."

*See also On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

■ Whatever expectation of privacy, subjective and objective, the appellant might initially have enjoyed, it came to an end when he consciously and deliberately invited Barbara Walters into his building. She entered the constitutionally protected area at the invitation of both of its co-owners. She heard the conspiratorial conversation aimed directly at her ears. She not only saw the kilo of cocaine in plain view, she touched it and tasted it as well. It was offered to her for purchase. The appellant willingly engaged in criminal conduct in front of the police agent and willingly exposed his contraband to her. There was no remaining expectation of privacy in what had already been

fully exposed. *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). What followed was merely mop-up.

The present case bears a remarkable resemblance to the decision of the United States Court of Appeals for the 11th Circuit in *United States v. Schuster*, 684 F.2d 744 (1982), *aff'd en banc*, 717 F.2d 537 (1983), *cert. denied*, 465 U.S. 1010, 104 S.Ct. 1008, 79 L.Ed.2d 239 (1984). There, as here, the police agent who, through artifice, insinuated himself into the criminal inner sanctum was a civilian confidential informant and not a law enforcement official. Indeed, the undercover informant, Charles Poteat, was actually an employee of the defendant. He was, moreover, a convicted felon who admittedly held a grudge against his defendant/employer. In that case, as here, the defendant initially approached the confidential informant with the information that the defendant had access to contraband which was available for sale. Whereas the contraband here was cocaine, the contraband there was counterfeit one hundred dollar bills.

There, as here, the confidential informant contacted federal investigators with the information. There, as here, the federal agents instructed the confidential informant to tell the defendant that he had secured a willing buyer and to obtain a sample of the contraband. There, as here, a meeting was arranged. The defendant, at that meeting, entrusted his apartment keys to the confidential informant.[2] The informant was told that he would find a sample counterfeit bill under a roll of toilet paper in a closet. Although only the informant had been given consent to enter the apartment, the informant took a Treasury Department Agent with him. It was the agent who went to the designated location in the closet and retrieved the sample one hundred dollar bill.

---

**2.** The apartment actually belonged to the defendant's girlfriend but, because the defendant resided there, there was no dispute as to his Fourth Amendment standing in the apartment.

The District Court, conducting a *de novo* suppression hearing, suppressed the one hundred dollar bill on the ground that the consent to enter the apartment given to the confidential informant did not extend to other police agents. The Court concluded that "the defendant never consented to a search by Agent Bowron" and that "the defendant was not aware that he was consenting to a search by government agents. He was led to believe that he was merely allowing one of his employees to enter the apartment."

The 11th Circuit overruled the District Court and upheld the warrantless entry into the apartment. Relying primarily upon *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), the Court of Appeals disposed of the defendant's contention that his "consent to Poteat was tainted by Poteat's deception of his purpose for obtaining the one hundred dollar bill." It then turned to and rejected the defendant's second contention that "even if the consent to Poteat was valid, it did not constitute an authorization nor give Poteat the right to extend the consent to Agent Bowron." The defendant Schuster had sought to distinguish his situation from *Lewis* on the ground that in *Lewis:*

> "the defendant 'invited' the *agent* into his home and the evidence obtained consisted only of the marijuana purchased by the agent. These facts, the defendant contends, do not involve a search and therefore alleviate any concern over a warrant. The defendant is correct to that extent. Virtually all cases are factually distinguishable, but that does not vitiate the underlying rule of law to be derived from *Lewis*." (underlining in original).

684 F.2d at 747–748. In addressing the contention, the 11th Circuit treated the confidential informant, whose status was indistinguishable from that of Barbara Walters' in this case, as a governmental agent and pointed out that he had received consent, just as Barbara Walters received consent here, to enter the constitutionally protected sanctuary and to take the contraband:

> "Everyone agrees that Poteat served as an agent of the government in his dealings with Schuster. Schuster gave

the apartment keys to Poteat for the specific purpose of obtaining the sample counterfeit $100 bill. By so doing, he *consented* to Poteat's entry into the residence and seizure of the incriminating evidence." (underlining in original).

684 F.2d at 748.

The 11th Circuit concluded that when, pursuant to the ruse, Schuster consented to the breach of his privacy by the confidential informant, he forfeited any objectively reasonable expectation that other police agents would not enter through the same breach:

"The facts of this case, however, do require us to extend the consent given to one agent to yet another full-time Secret Service agent.

. . . . .

'As this Court has held repeatedly, additional investigators or officials may ... enter a citizen's property after one official has already intruded legally.' " (citations and footnotes omitted).

684 F.2d at 748.

In the *Schuster* case, what was first discovered and then recovered when the additional police agent entered the building was nothing more than what had already been voluntarily revealed and offered to the undercover agent in the first instance. In the present case, what was first discovered and then recovered when the additional police agents entered the building was nothing more than what had already been voluntarily revealed and offered to Barbara Walters in the first instance. In this regard, the 11th Circuit observed, at 684 F.2d 748:

"We perceive no valid reason to invalidate Agent Bowron's seizure of the counterfeit $100 bill. Poteat and Bowron entered the apartment *together*. At Poteat's direction, Bowron went directly to the *specified* location, lifted the *identified* roll of toilet tissue, and retrieved the *designated* sample $100 bill." (footnote omitted) (emphasis in original).

With nothing more than a change of names, that factual scenario is indistinguishable from the one at bar:

"At [Walters'] direction, [Agent Tamez] went directly to the *specified* location ... and retrieved the *designated* [brick of cocaine]."

A situation analogous to that before us in this case was before the 5th Circuit in *United States v. Brand*, 556 F.2d 1312 (1977). An ambulance received an emergency call to assist a drug overdose victim. A foot patrolman arrived at the home simultaneously to help the ambulance attendants. As all emergency personnel were coming to the assistance of Charles Brand lying unconscious on his living room floor, the patrolman noticed hypodermic needles, marijuana butts, and several pills in the living room. As Brand was being placed in the ambulance, a second officer arrived at the home and remained therein after most of the family members accompanied Brand to the hospital. The second officer observed the same contraband in the living room that had earlier been observed by the first officer.

The two of them then walked into an adjoining bedroom, where they found additional contraband. At that point, they called a special narcotics investigator to the scene. The narcotics investigator confined his processing of the scene to the items in the living room and used that as a basis for obtaining a search warrant for the rest of the house.

Brand argued that only the first officer had entered the house legally and that once the medical emergency had subsided, that exigency could no longer serve as justification for the subsequent entries of first the second officer and then the narcotics investigator. He argued that their entries and the investigative fruits thereof were suppressible, absent additional justification. The 5th Circuit found no impediment to the subsequent entry of additional officers, holding at 556 F.2d 1317:

"We reject the defendant's contention because it misconceives the nature of the fourth amendment interest at

stake. The amendment protects the citizen against invasion of privacy. Once that interest is invaded legally by an official of the State, the citizen has lost his reasonable expectation of privacy to the extent of the invasion. As this Court has held repeatedly, *additional investigators. or officials may therefore enter a citizen's property after one official has already intruded legally*.... Later arrivals may join their colleagues even though the exigent circumstances justifying the initial entry no longer exists." (footnote and citations omitted) (emphasis supplied).

In *United States v. Rubio*, 727 F.2d 786 (1983), the 9th Circuit was dealing with a simple act of consent to one police investigator to search for evidence of crime. The 9th Circuit held, however, that the consenting party's effort to restrict the entry to a single officer and to preclude the entry of additional officers was to no avail:

"Once consent has been obtained from one with authority to give it, any expectation of privacy has been lost. We seriously doubt that the entry of additional officers would further diminish the consenter's expectation of privacy."

727 F.2d at 797.

Once Barbara Walters, operating as part of the police team, observed the cocaine in plain view, the appellant lost any privacy interest he theretofore may have had. As the Supreme Court observed in *Illinois v. Andreas*, 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003, 1010 (1983):

"The plain-view doctrine is grounded on the proposition that once police are lawfully in a position to observe an item firsthand, its owner's privacy interest in that item is lost; the owner may retain the incidents of title and possession but not privacy."

In terms of any retained incidents of title and possession, the short answer there is that contraband, by definition, is something in which a private person is prohibited by law from having any right of ownership or possession.

The remaining contentions will not detain us long. The appellant argues that the evidence was not legally sufficient to support the conviction. He maintains that it was not sufficient to connect him with the cocaine and was not sufficient to indicate an intent to distribute. The testimony of Barbara Walters connected him to the drugs and fully demonstrated his intent to distribute. The agents surrounding the building observed him arrive carrying the suitcase in which the cocaine was later found. Its very quantity (over a kilogram) was sufficient to establish the same *mens rea*. The taped telephone conversations abundantly demonstrated both criminal agency and intent to sell.

The appellant raises another argument that Judge Missouri erroneously permitted an amendment of the conspiracy charge that amounted to a change of substance and not merely of form. The issue is obviously moot in that the jury found the appellant not guilty of the conspiracy charge.

Another contention is that Judge Missouri erroneously refused to instruct the jury on the subject of entrapment. The appellant, however, fails to advance even the most insubstantial rationale to suggest even a fantasy of conceivable entrapment. The issue was not generated by the evidence and the instruction was properly denied.

The appellant also complains about two evidentiary rulings when Barbara Walters was on the stand. He contends that she should not have been permitted to testify about an earlier occasion when the appellant supplied the cocaine for a party she was hosting. Although the appellant argues that this was offered to show his predisposition to crime, the State counterargues that it was offered to show the preexisting close relationship between Ms. Walters and the appellant. In any event, Judge Missouri gave a curative instruction that the evidence should only be used to show "the relationship between the parties, and for no other purpose." The appellant agreed that it was a proper instruction. The appellant, moreover, in later cross-exami-

nation of Barbara Walters, reverted to the subject several times and sought to turn it to his own advantage. *Cf. Hunt v. State,* 321 Md. 387, 433, 583 A.2d 218 (1990). We see no error.

■ The second evidentiary ruling involved the appellant's attempt to impeach Barbara Walters by showing that she dealt in drugs. The issue involved only her conduct and not a criminal conviction. Outside the presence of the jury, Barbara Walters was examined and cross-examined and denied having supplied the appellant with drugs. Judge Missouri ruled that appellant's counsel should not, in the presence of the jury, refer to Barbara Walters as a "drug dealer." The appellant never adequately proffered what it was he was attempting to develop and it is by no means clear that this issue is preserved for appellate review. Quite aside from nonpreservation, however, this was an evidentiary ruling entrusted to the wide discretion of the trial judge and we perceive no clear abuse of that discretion.

■ The appellant's final contention has merit. He was convicted of possessing cocaine with intent to distribute under Art. 27, § 286(a)(1). A separate conviction and sentence, under the circumstances, for the possession of 448 grams of cocaine cannot stand. Section 286(f)(1)(ii), dealing with the possession of 448 grams or more, is simply a sentence-enhancing provision and does not spell out a separate crime. The State acknowledges error in this regard and the erroneous conviction will be vacated.

CONVICTION UNDER SECOND COUNT FOR VIOLATION OF ART. 27, SEC. 286(f)(1)(ii) VACATED; IN ALL OTHER RESPECTS, JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.